**STAALKAT OF AMERICA, INC.**

**v.**

**UNITED STATES.**

**C.D. 3130; Protest Nos. 64/23307–103823.**

United States Customs Court,
Second Division.

Sept. 27, 1967.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak and L. M. Fertman, Los Angeles, Cal., of counsel), for planitiff.

Carl Eardley, Acting Asst. Atty. Gen. (James S. O'Kelly and Brian S. Goldstein, trial attys.), New York City, for defendant.

Before RAO, FORD, and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in this case is a Staalkat egg handling machine, the same in all material respects as that involved in Staalkat of America, Inc. v. United States, 54 Cust.Ct. 161, C.D. 2526, the record of which was incorporated herein. The machine was assessed with duty at 13¾ per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, as an article having an an essential feature an electrical element or device. It is claimed that the merchandise is free of duty under paragraph 1604 of said tariff act as an agricultural implement, or, alternatively, that it is dutiable at 11½ per centum ad valorem under paragraph 372 of said tariff act, as modified by the Sixth Protocol of Supplementary Con-

cessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T. D. 54108, as a machine not specially provided for.

The pertinent provisions of the tariff act are as follows:

Paragraph 353, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, * * * wholly or in chief value of metal, and not specially provided for:

 * &ast; * * * * * *

  Other (except * * *) .................... 13¾% ad val.

Paragraph 1604:

Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.     [Free]

Paragraph 372, as modified by T.D. 54108:

Machines, finished or unfinished, not specially provided for:

 * * * * * * * *

  Other (except) * * * .................... 11½% ad val.

---

In the incorporated case, the court described the function of the machine in the words of the witness, Dr. Cliff D. Carpenter, as follows (p. 162):

Generally the machine separates—it has 3 functions: It separates the eggs by sorting, by a weighing device, into various weights, for example, a standard dozen eggs, which we call a standard dozen eggs, weighs 24 ounces. A medium egg, a dozen weighs 21 ounces. Small eggs weigh 18 to 21 ounces; and then we can go on down to peewees in the order of some 15 ounces. Then we get on the larger side, extra large might be considered in the range of 26 or 27 ounces to the dozen. Then we get into jumbos. So we set up from peewees to the extreme end, 8 different recognized weights of eggs. So this machine divides those eggs, be-

cause hens don't lay all eggs the same size.

The second thing it does, it provides for viewing by what we call flash candling, the interior quality of the egg, and this is the word "grading."

And then it provides also as the eggs are rolled off the weighing scales onto the gathering tables or down the lanes, it provides for a marking service or mechanism for any reason if you wish to identify the egg by a specific symbol.

The court stated that the primary issue was whether an article performing the three functions mentioned falls within the intendment of the provisions for agricultural implements in paragraph 1604. It held that it did not on the ground that the sorting, grading, and marking of eggs

was a marketing process and not an agricultural pursuit. It stated (p. 164):

> Nevertheless, the true test for the determination of whether a machine such as is involved herein, the sole functions of which are the sorting, grading, and marking of eggs, is an agricultural implement is not who owns it or where it is used, but, what is its chief use? In other words, is it chiefly used for agricultural purposes? Irrespective of who owns the instant machine or where it is located, it seems obvious that it performs the functions of a marketing device, and is not one devoted to the agricultural production of food, to wit, eggs. Therefore, the machine is clearly excluded from the provision for "agricultural implements." Every article used by a farmer is not necessarily an agricultural implement within the intendment of paragraph 1604, supra. W. J. Byrnes & Co. v. United States, 30 CCPA 166, C.A.D. 229.

It held further that the imported article could utilize power other than electricity without modification or change to the machine *per se*, but that since the candling process, which was essential to the operation of the machine, required the use of fluorescent lights, the machine was properly dutiable under paragraph 353, as modified, as an essentially electric article.

Plaintiff claims that the record presented in the instant case establishes that the Staalkat machine is utilized in the preparation of eggs for market and is clearly an agricultural implement, and that the Staalkat machine can be and is used without the candling function, and is therefore not an essentially electrical article. Defendant claims that the machine is not chiefly used for agricultural purposes but performs the functions of a marketing device, and that the evidence does not establish that the electrical features are not essential to the machine's intended operation.

It appears from the testimony of Dr. Carpenter in the incorporated case that the purchasers of the Staalkat machine fall into 4 categories: Producers, that is, independent farmers; farmer-owned cooperatives, that is, a group of farmers marketing through a cooperative association; the farmer-processor, that is, the man who is both a processor and does his own marketing and is also a producer; and the processor who owns no poultry and does not produce any eggs, but buys them and does the function of candling, sorting, packaging, and marketing.

Dr. Carpenter said that about 20 percent of the Staalkat machines are owned by independent processors, market men who own no layers, and the balance by those in the other three categories. He felt that more than half were owned by individual producers and farmer cooperatives and the rest by farmer-processors. He said that only those farmers who had 50 to 100,000 layers were interested in owning Staalkat machines.

According to Dr. Carpenter, some Staalkat machines owned by farmers, farmer cooperatives, and farmer-processors are located on farms. In the case of farmer cooperatives, they may be on farms or they may be in centralized plants that the cooperative general management operates for the farmer. In the case of farmer-processors also, they may be on farms or in centralized plants for collection of large numbers of eggs. The witness thought about 40 percent were in centralized plants and 40 percent on farms.

Dr. Carpenter, who was a consultant to the Staalkat Co., and whose compensation depended on the number of machines brought in, testified that there were 150 Staalkat machines in the United States. Another witness who had the agency for the western half of the country said 59 of them were in the west. Olson Brothers, Inc., a processor which had an interest in some farms, owned 16; Nulaid Farmers Association had six or eight; the Perry Egg Company, a processor, had two; McAnally, a farmer-processor, had four; the Farm Fresh Egg Corporation, a processor, had one; Canoga Egg Ranches, a processor, had one; a farmer-processor in Wisconsin had four.

In the instant case, Louis P. Corbetta, president of Certified Egg Farms, testified that the entity owned four ranches devoted to the production of eggs, and a packing plant located on one of the farms. It had 480,000 layers on the four farms. Olson Brothers had an interest in the farms and took the entire production. The farm entity owned three Staalkat units which were at the packing plant and were used for sorting eggs, but not for grading or candling. Mr. Corbetta said that after eggs are laid, they are collected loosely and trucked to the packing plant where they are washed, sorted, graded, and placed in cartons supplied by Olson Brothers. The Staalkat machine is used to weigh the eggs, differentiate the weight of one egg against the other, sort them into five categories, and roll them to a gathering location from which they are packed. Candling is done by another device. The witness said that when the eggs leave the farm they are the property of Olson Brothers but in many cases they go directly to stores. Twenty percent are taken to a local warehouse for redistribution later to other outlets.

Mr. Corbetta described the so-called revolution in the egg-producing industry as follows: Four years ago there were 780 producers producing the same quantity of eggs that now are being produced by 120; each of the farmer entities has grown six times as large on an average as it was four years ago; at that time only a handful of packing plants were situated on farms which packed their own eggs; there were associations which owned plants where eggs were washed, graded, sorted, and packed; the revolution has resulted in larger farm entities which can afford to have packing plants of their own. The Staalkat machine is adapted to such use because for a relatively modest investment, a farmer can process his entire output economically and realize a greater profit. One reason for this is that the machine can be operated by ordinary ranch labor which is paid less than must be paid by a city packing plant.

Gradation of eggs, according to the witness, is an industry-accepted process, and is required by the laws of California. Eggs cannot generally be marketed to the consumer until they have been washed, sorted, graded, and packed, but if these processes were not done on the farm, Olson Brothers would do it in their central plant.

While the Staalkat machine does not improve the quality of eggs *per se* nor further their production, the consumer may benefit to the extent that the eggs are packed by the farmer two days sooner than they could have been at a city plant, so the consumer receives fresher eggs.

The Staalkat machine is also used on the Demler Farms which produce both hatching eggs and marketing eggs. Hatching eggs are put through the Staalkat grader where they are sized and the more desirable eggs are selected and put into hatching trays and used in the incubation process. This is essential to the operation of the hatchery because a good productive bird which lays the right sized eggs must be hatched from a breeder that likewise lays desirable eggs. Demler does not use its Staalkat machines for candling.

Mr. Demler also referred to the change from family type operations to the larger business type operations, which handled breeding and housing of chickens and the handling and production of eggs, including "the ranch processing of the eggs." He noted that the number of producers in California had decreased from 10,000 to 1,500 in the last 15 years. The Staalkat machine fits the average sized farm of today better than some of the larger packing units which are more desirable on larger operations of processing plants. Those who operate the machine on the farm are regarded as agricultural laborers rather than industrial laborers.

The Demler farm produces 50 to 60 million eggs a year. It markets 25 percent of its own eggs and the rest go to distributors who get them after they have been graded and sorted. They do nothing but sell them. When asked what

he regarded as marketing of eggs, Mr. Demler testified:

> A. I believe after the eggs leave the nest and are delivered into the processing plant and I think the marketing takes place from the standpoint of time that we start moving it through our equipment and processing so that it meets the state and federal laws.

> \* \* \* \* \* \*

> Q. In your opinion is the use of the Staalkat machine part of the production of eggs or part of the marketing of eggs?

> \* \* \* \* \* \*

> A. We feel, of course, that in the use of this equipment in our operation it's part of the production and marketing. We can't do one without the other.

Mr. Demler also stated that it is generally necessary for farmers to sell eggs to distributors after they have been candled, sorted and graded; that distributors have found it desirable to pick up eggs at the ranch and distribute them right to the store; that the trend is away from hauling eggs to a central place.

In the incorporated case, Lawrence N. Thompson, an employee of Olson Brothers, Inc., testified that Olson Brothers, Inc., owned no chicken farms but that the Olson Brothers owned and had interests in other ranches. At that time Olson Brothers Inc., owned 16 Staalkat machines and serviced 160 farmers. Eight of the machines were located on farms.

Three years later, John Meade Huntsman, general manager for operations for Olson Brothers, Inc., testified that Olson operates 25 processing plants, has 10 ranches of which it either owns 100 percent or a 50 percent interest, has 11 or 12 ranch packing operations where it has its equipment on ranches other than its own, has three egg products plants, and a research and development facility. It operates primarily in Southern California, but has substantial operations in other parts of California, Nevada, Arizona, Texas, Oklahoma, a 50 percent owned operation just outside Philadelphia, one outside of Chicago and in the Hawaiian Islands. It has 27 Skaalkat machines in its plants or on various ranches of producers which ship eggs to it. All are used for candling at well as sorting. The witness said the firm has only recently become involved in the actual production on the ranch, but that as far as the handling of eggs are concerned, he believed it was the largest independent processor and distributor in the world. It sells 100 million dozen eggs per year, of which 5 to 7 percent are produced on its own ranches. In all the ranches in California in which it has an interest, processing facilities are right on the ranch. In Texas, Arkansas, and Arizona, Olson has just shifted to not processing on the ranch because it has a combined central location to which several ranches ship. In Dallas, it is shifting processing to the ranch. Eggs are processed on the farm for greater efficiency and because labor rates are cheaper. By processing, the witness referred to washing, candling, sizing, cartoning, and casing, Through combining production of chickens, milling feed, production of eggs, and processing eggs in one area, a much fresher product arrives at city distribution plants. After processing, eggs go to different places, depending on their grades.

The witness explained that several years ago the firm used to operate various plants in urban areas to which eggs were brought directly from the ranch for processing and distribution. The trend over the last 3 or 4 years has been to separate distribution from processing so that 80 percent of the urban plants are now strictly distribution facilities. The distribution of eggs entails receiving the eggs at the plants, unloading them, placing them in coolers, loading them on various delivery trucks, going back to stores and bringing back eggs that may have been broken or cracked, plus the usual billing and office work. In some plants the firm still engaged in combination processing and distribution and in such instances the witness said it would be difficult to separate the two functions.

Eggs are not marketable to the final consumer before they are processed but they can be sold to other egg dealers and processors.

According to the witness, the Staalkat machine was not one of the major factors contributing towards ranch operation by his company, but once the trend had developed, it became a major factor in allowing the firm to operate efficiently and at low cost where skilled help was not available.

Where eggs are purchased from farmers and processed by Olson the farmers are paid on a grade-back basis. The Staalkat machine weighs the eggs and farmers are paid on the basis of the qualities sent. The machine is a very accurate means of determining what the fair pay and grade-back should be to the farmer. For that purpose it does not make any difference whether the farmer or Olson owns the machines.

The witness was asked to explain his concept of "marketing" and testified as follows:

A. As I indicated, this is a difficult one to really draw clear cut lines as far as a definition is concerned.

Q. Maybe I can make it more specific. Is it the actual selling of eggs? —A. The selling of eggs is, the way our company handles it, is that we have a processing plant in the country near the ranches and we process the eggs there and load them on trucks and deliver them to distribution plants.

\* \* \* \* \* \*

A. \* \* \* Selling is when you sell the eggs to the ultimate consumer.

Q. What is marketing? It must have some meaning.—A. As I indicated to you the way our company considers marketing and we have different ways, depending on the plant we are talking about. In the urban areas I would say that approximately 70 to 75 percent of our volume we would not consider an egg marketable or in the marketing stages until it was loaded on a truck after the processing plant, taken to our distribution plant, and then sent out through marketing channels.

The witness regarded marketing and distributing as the same thing.

The primary question here is whether the Staalkat machine is classifiable as an agricultural implement.

In an early case on this subject it was held that while the term "agricultural" had in general a broad meaning, as used in the Tariff Act, it referred only to those elements which pertain to the production of food or raiment for man. United States v. Boker & Company, 6 Ct.Cust. App. 243, T.D. 35472. Subsequent cases have extended coverage to devices used in the successful raising of poultry, the storage and transportation of crops and the sortage of seeds for use on the farm. United States v. S. S. Perry, 25 CCPA 282, T.D. 49395; Inter-Maritime Forwarding Co., Inc. v. United States, 45 CCPA 125, C.A.D. 685; J. C. Findlay v. United States, 36 Treas.Dec. 283, T.D. 37964; Renfrew Machinery Co. (Ltd.) v. United States, 42 Treas.Dec. 327, T.D. 39382; Wilbur-Ellis Co. v. United States, 26 CCPA 403, C.A.D. 47; C. J. Tower & Sons v. United States, 32 Cust.Ct. 54, C. D. 1579; D. Landreth Seed Co. v. United States, 2 Cust.Ct. 272, C.D. 141.

On the other hand, they have excepted implements not shown to be chiefly used by individual farmers on the farm or by organizations of farmers for transportation, and items used in manufacturing establishments or mills to produce food products. United States v. Spreckels Creameries, Inc., 17 CCPA 400, T.D. 43835; Ohio Butterine Co. v. United States, 34 Treas.Dec. 465, T.D. 37656; Eddey Bellefleur v. United States, 40 Treas.Dec. 441, Abstract 44462.

In the *Ohio Butterine* case, the court held that a churn constructed and designed for making oleomargarine, intended to be installed in a manufacturing establishment which had nothing to do with the conduct or operation of a farm, was not an agricultural implement. It indicated, however, that a churn used to make butter on a dairy farm might be considered an agricultural implement.

In Eddey Bellefleur v. United States, supra, the court held that a machine used to crush oats to produce cattle feed, connected with the equipment of a country mill, was not an agricultural implement. The court said that to so hold because the work performed by it produced a commodity used by farmers would make the millers co-beneficiaries with the farmers, which was not the intention of Congress.

However, there is language in various cases and authorities to the effect that the preparation of crops for market pertains to agriculture and that implements employed to that end are agricultural implements.

In J. C. Findlay v. United States, supra, the court referred to the *Boker* case, and said that it did not mean to limit the meaning of the word "production" to implements employed in the initial act of cutting down crops or shearing wool, but that "production" did not cease until the crops were garnered, stored, and placed in convenient form for storage and transportation, and introduced into the channels of trade ready to have applied to them the first step of preparation which would finally render them adaptable as food or raiment. The court held that wool presses, used exclusively on sheep ranches to press wool into bales preparatory to transporting it to market, were agricultural implements.

In National Labor Relations Board v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, it was stated that Congress has recognized that the packing and preparing of agricultural products for market is a necessary incident to any agricultural operation and it was held that the washing, packing and preparing for market of products from one's own farm was an agricultural operation, whereas buying, packing and marketing the crops of another for compensation was a commercial enterprise. It held that employees who were engaged in grading and packing tomatoes grown on the farm of the respondent were engaged in agricultural labor.

The Summary of Tariff Information 1921, p. 1224, states that the term "agricultural implements" includes those used in "plowing, planting, reaping and preparing crops for use in their raw form or for manufacture". The Summaries of Tariff Information 1948, Volume 16, page 79, state that the coverage includes machines for "threshing, sorting, cutting, grinding and otherwise preparing crops for market".

Some indication of Congressional intent may also be obtained from legislation which became effective after the importation involved herein. The Tariff Schedules of the United States provide in item 666.00 for the free entry of—

Machinery for soil preparation and cultivation, agricultural drills and planters, fertilizer spreaders, harvesting and threshing machinery, hay or grass mowers (except lawn mowers), farm wagons and carts, and agricultural and horticultural implements not specially provided for, and parts of any of the foregoing.

Subsequently the Tariff Schedules Technical Amendments Act of 1965, Public Law 89–241, 79 Stat. 933, inserted after the words "farm wagons and carts" the following: "milking machines, on farm equipment for the handling or drying of agricultural or horticultural products".

House Report No. 342 which accompanied the bill stated that the amendment was enacted in order to make specific the free status of said equipment. The Senate Report on the same bill stated that these provisions clarified the duty free status of certain agricultural machinery and equipments by adding the provisions for milking machines and on-farm equipment. (Senate Report No. 530, U. S. Code Congressional and Administrative News 1965, vol. 2, p. 3422).

■■   In view of these authorities it appears that the provisions for free entry for agricultural implements, not provided for specially in tariff acts, include on-farm equipment for handling, packing, preparing for market, crops produced on the farm, but does not include equipment used commercially for packing or market-

ing for others or for the manufacture of food products. Such preparation for marketing must be as an incident to production by the farmer and not primarily as an incident to marketing as a separate enterprise.

The Staalkat machine involved herein has no function or use in the production of food or raiment for man; its use does not improve the quality of eggs; although employed in the efficient raising of poultry, that is not its chief use; it is not used merely to put eggs into convenient form for transportation to market. It is designed and used to sort eggs according to size, and is designed and in many cases used in candling or grading eggs. According to Dr. Carpenter, it helps very materially in marketing eggs. Sorting and candling are not strictly necessary to the sale of eggs by the farmer as they can be sold to processors or distributors who will perform these operations before sale to the ultimate consumer. Some eggs are still bought unwashed and ungraded by the consumer directly from the farmer. Mr. Corbetta testified that marketing to the ultimate consumer was a very complicated operation performed by distributors and dealers.

The evidence presented here does not clearly establish that these machines are chiefly used on farms or by farmers. In the incorporated case, Dr. Carpenter testified that there were 150 Staalkat machines in the country, but the location or ownership of only 36 of them was shown. These were owned by processors or so-called farmer-processors. Dr. Carpenter testified further that 20 percent of the machines were owned by processors and that the rest were owned by large independent farmers, farmer cooperatives or farmer-processors. His testimony indicates that 40 percent were owned by independent farmers and cooperatives and 40 percent by farmer-processors. The machines owned by cooperatives were located on farms or in centralized plants operated by the cooperative's management.

There is no evidence in either case as to the nature of the cooperatives or their operations nor does it appear whether the machines were the property of the organizations or of the individual farmers. The cooperatives may have been engaged merely in operating Staalkat machines or they may have engaged in extensive marketing or manufacturing operations. The fact, if it be a fact, that they were owned by farmers does not establish that they were engaged primarily or even substantially in agriculture within the meaning of that term as used in the tariff act.

In an analogous situation, it was held in United States v. Spreckels Creameries, Inc., supra, that cans for the transportation of milk were not shown to be chiefly used as agricultural implements. The court there stated (p. 404):

It is manifest that the foregoing testimony is not sufficient to establish the fact that the chief use of these milk cans is upon the farm or by farmers, nor is it sufficient even to show that chief use is for transportation by cooperative creamery organizations composed of farmers.

The appellee creamery company is not itself engaged in agriculture, but in processing an agricultural product, and the chief use satisfactorily shown by the evidence in the case is only that by appellee, which we do not think can be declared agricultural in its nature.

We are not, therefore, presented with a case wherein there is shown chief use either by individual farmers on the farm itself or by organizations of farmers for transportation. Nor does it appear that the chief use is made up of a combination of use on the farm and transportation by farmers' organizations.

The testimony is equally vague as to the operations of the so-called farmer-processors. Dr. Carpenter said they were owners of large flocks, did their own marketing, and processed and distributed eggs for others. He said that the larger the flock a farmer owned, the more apt he was to become a farmer-processor, and the smaller the flock, the more apt he was to sell to an independent processor.

Whether the operations of the so-called farmer-processors were chiefly production or chiefly processing does not appear except in the case of Olson Brothers. At the time of the second trial, the operations of that firm had expanded and included almost all phases of the egg industry from growing to manufacturing and research. However, it was chiefly engaged in the processing and distribution of eggs. It owned 27 Staalkat machines. Some of these appear to have been located on farms and others in central plants. Not all of these farms were owned by Olson. It was also disclosed that while there was a trend to have the sorting and candling done on the farm, a return to central plant operations occurred whenever that became more economical or convenient. In the Chicago and Philadelphia areas, Olson had a 50 percent interest in corporations owning birds. It managed ranches and processed eggs, which are picked up and marketed by chain stores, which are also partners.

The evidence in the present case and the incorporated one relates primarily to uses in California and the southwest, except for the operations of Olson in Philadelphia, Chicago and Hawaii. Chief use must ordinarily be established on the basis of testimony representative of an adequate geographical cross-section of the country. L. Tobert Co., Inc., American Shipping Co. v. United States, 41 CCPA 161, 164, C.A.D. 544. Evidence of chief use in one state or one part of the country alone will not establish such use throughout the United States. Pacific Guano & Fertilizer Co. et al. v. United States, 15 Ct.Cust.App. 218, T.D. 42240; United States v. Spreckels Creameries, Inc., supra. Since in the instant case, it is not clear that these machines are chiefly used on the farm and by farmers or in central plants by processors or distributors, evidence of usage throughout the country is necessary in order for plaintiff to sustain its case. Usage in different sections of the country may well be different. W. J. Byrnes & Co. et al. v. United States, 57 Cust.Ct. 148, C.D. 2746.

Furthermore, it does not appear that the witnesses themselves regarded the processing operation here involved as part of agricultural operations. Mr. Corbetta said, "All the farm functions of the ranch proper are extended to the packing plant," which performed a function previously performed at a great big city plant by a cooperative. Other witnesses also referred to packing or processing plants. They were unable to clearly relate this processing to "production" rather than to "marketing" or "distribution".

When such processing is done off the farm it can hardly be regarded as an agricultural operation. Formerly it was done by cooperatives or processors in central plants, often in large cities. This is still done, although apparently to a lesser extent. Can this change in location where the processing is done, or by whom it is done, make it an agricultural operation now when formerly it was not? We think not, especially on the basis of the record here presented which does not establish that the machines used for the processing were chiefly used on farms or by farmers.

In our view, the record presented does not establish that Staalkat machines are chiefly used on farms or by farmers or that they can be considered on-farm equipment for handling agricultural products or for preparing crops for market as an incident to farming. Implements chiefly used by processors or distributors do not fall within the Congressional intent to benefit the farmer. Certainly, it was not intended that those chiefly engaged in processing or marketing should be co-beneficiaries. Eddey Bellefleur v. United States, supra. We hold, therefore, that the Staalkat machine involved herein is not entitled to free entry under paragraph 1604, supra, as an agricultural implement.

Plaintiff claims in the alternative that the Staalkat machine is not an article having as an essential feature an electrical element or device on the ground that it could be and was used without

the candling function which was held to be an essential feature in the incorporated case. There was evidence that some operators do not use the candling function and that some machines do not have this feature. However, it would appear that most of the owners of the machines, including Olson Brothers, which owns 27 of them, use the candling feature. There is no evidence that the candling feature could be operated in the way it was designed by the use of anything other than electric lights. The machine before the court did have the candling feature. (See packing specifications). Whether used or not, an electrical element (fluorescent lights) was an essential feature for the operation of one of the intended purposes of the machine.

Mr. Corbetta testified that although the machines on his farms do not contain the candling feature "if the Staalkat incorporates a candling unit which is used by the operator of the machine it is essential".

It appears that this machine is designed to have and does have 3 functions —sorting, grading or candling, and marking. While the marking device seems to be a minor auxiliary feature generally not used in this country, the candling feature is one of the primary functions without which the machine can not be used to its full potential. It was used by Olson Brothers, who owned a large number of machines. It would appear that, as stated in the incorporated case, it is highly unlikely that a person would buy a Staalkat machine with the candling feature and use it for sorting only.

In United States v. Baker Perkins, Inc., et al., 46 CCPA 128, C.A.D. 714, it was held that a cocoa grinding mill was not an essentially electrical article since it could be operated by other than electric power. It was also held that an electro-magnet, whose function was to extract metal particles which happen to be among the cocoa nibs which are fed into the machine, was not an essential part thereof. The court concluded:

&ast; &ast; &ast; There is no direct connection between the function of the electro-magnet and the mill *per se*, the former merely constituting an auxiliary although a desirable step in the reduction of cocoa nibs to chocolate liquor. The particles of metal could easily be separated from the nibs at some point far removed from the imported machine. We feel that the function of the electro-magnet in this milieu is too remote from the principal function of the cocoa mill to term the device an "essential" feature of the machine under paragraph 353. In the absence of tramp iron in the feed, the mill would function equally as well without the magnet and we regard it as we would regard an electric clock or light affixed to the machine for convenience, not as an "essential feature".

In John A. Steer & Co. v. United States, 24 CCPA 293, T.D. 48737, it was held that an electrical heating apparatus in an anhydrous ammonia plant did not make it an electrical machine. The court stated (pp. 299–300):

&ast; &ast; &ast; It has, it is true, an electrical heating element by which the synthesis of the gases is inaugurated, but so, to the same extent, does a gasoline automobile which has its electrical starting device, or an oil burner for a furnace which has its spark plug to start ignition. Yet we dare say no one would seriously contend that such devices should be classified within paragraph 353, even though there were no specific provisions for automobiles or oil burners within the tariff act. Such devices would still be gasoline automobiles and oil furnaces. &ast; &ast; &ast;

In Consolidated International Equipment & Supply Co. v. United States, 56 Cust.Ct. 442, C.D. 2671, paper cutters having back gauges to bring up the ream of paper to the cutting position, and electric eyes, were held not to be essentially electric. The driving motors could be readily removed and another source of power substituted without substantial modification. The back gauge could be manually operated and 95 percent of the

paper cutters do not have the electric eyes.

 In the instant case the candling feature is one of the primary parts of the machine rather than being remote from its principal function or a mere auxiliary feature.

The record in both this case and the incorporated case establishes that most of the Staalkat machines imported had the candling feature and that in most cases it was used.

In our view, its presence in the imported machine makes it an article having as an essential feature an electrical element or device properly dutiable in paragraph 353.

Accordingly, the protest is overruled and judgment will be entered for the defendant.

RAO, C. J., and FORD, J., concur.