(C.D. 4241)

JAMES G. WILEY Co., A/C J. R. BATEMAN *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 29, 1971)

*Stein & Shostak* (*S. Richard Shostak* and *Leonard M. Fertman* of counsel) for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Frederick L. Ikenson* and *Steven P. Florsheim*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case concerns the proper tariff classification of so-called Racealigners that are used in conjunction with the alignment of front wheels of automobiles. The Racealigners—which were imported from Canada via the port of Los Angeles in 1963, 1964 and 1965—were classified by the government as other non-optical measuring or checking instruments, apparatus, and machines under item 710.80 of the tariff schedules and assessed duty at the rate of 15 percent.

Plaintiff claims the import is properly classifiable under the basket provision in item 678.50 of the tariff schedules for machines, not specially provided for, with duty at the rate of 10 percent.

Quoted below are the pertinent provisions of the tariff schedules:

Classified under:

Schedule 7, Part 2, Subpart C:

\* \* \* \* \* \* \*

> \* \* \* non-optical measuring or checking instruments, apparatus, and machines not specially provided for; and parts of the foregoing articles:

> \* \* \* \* \* \* \*

710.80                       Other _____ 15% ad val.

Claimed under:

Schedule 6, Part 4, Subpart H:

678.50       Machines not specially provided for, and parts thereof_____10% ad val.

It is to be noted that the imports here in issue are identical with the Racealigners involved in *James G. Wiley Co., a/c J. R. Bateman* v. *United States*, 62 Cust. Ct. 257, C.D. 3738, 296 F. Supp. 955 (1969), the record in which was (without objection) incorporated in the present case. In *Wiley*—which was decided under the Tariff Act of 1930 [1]— the court held that the Racealigners were properly dutiable as machines, not specially provided for, under paragraph 372 of the 1930 act, as claimed by plaintiff, rather than as articles of base metal, not specially provided for, under paragraph 397, as classified by the government.[2]

---

[1] The Tariff Act of 1930 did not contain a provision for non-optical measuring or checking instruments, apparatus, and machines.

[2] The court, in addition, rejected the government's alternative claim that the Racealigner was classifiable as a "mathematical instrument" under paragraph 360. The basis of the holding was that the record showed that the Racealigner as a whole did not constitute a mathematical instrument but rather showed that the Racealigner is a machine which incorporates, as a part thereof, a mathematical instrument. 62 Cust. Ct. at 265.

Against this background, there is no doubt that Racealigners constitute machines. The question now is whether they come within the specific provision of 710.80 of the tariff schedules covering non-optical measuring or checking machines, as classified by the government. And on this question, it is plaintiff's contention that the Racealigner is a multipurpose machine whose principal function is not measuring or checking, and that it is therefore more than a measuring or checking machine and thus properly classifiable under item 678.50 as a machine not specially provided for.

We begin with the record in the incorporated *Wiley* case which is extremely relevant in illuminating the facts concerning the Racealigner. Those facts were well summarized by the court as follows (62 Cust. Ct. at 259–61) :

> Racealigners are utilized by automobile mechanics for checking the misalignment of a vehicle's front wheels. Plaintiff's only witness, John Roy Bateman, testified without contradiction that he was the ultimate consignee and the exclusive distributor of Racealigners in California, Oregon, and Nevada; that the Racealigner is the only wheel alignment device which is attached to the automobile's spindle,[1] and in effect takes the place of the front wheels which are removed, while aligning the front end of the automobile. It further appears that the Racealigner is designed to take alignment readings from the machined surfaces of the spindle, and permits the making of necessary adjustments with the wheels removed from the automobile.

> \* \* \* [T]he \* \* \* Racealigner and its component parts \* \* \* are :

> 2 "A" frames
> 2 Turn plates
> 1 Radius gauge
> 1 Turn plate handle
> 1 Adjustment gauge
> 2 Small compact collets
> 2 Large compact collets
> 2 Small standard collets
> 2 Medium standard collets
> 2 Large standard collets
> 2 Spacer rings

> The two "A" frames are in the form of legs which attach to the spindles and rest on the turn plates; the turn plates utilize roller bearings so that the Racealigner can move without friction; the radius gauge extends from the outer part of each of the "A" frames and passes through them by means of a spring-loaded cable, giving the toe-in and toe-out readings in degrees and inches; the turn plate handle fits into a hole in the turn plate and affords leverage, or a magnification of power, in turning the front wheels, the worm gear of the automobile, and placing in motion the entire steering mechanism.

---

[1] The front wheels and their bearings rotate on the spindle.

The adjustment gauge * * * is attached to the "A" frames and gives the readings for caster (the forward or backward tilt of the spindle) and camber (the inward or outward tilt of the wheel). It has moving parts, consisting of a small outer knob and a larger inner knob that turn (either clockwise or counterclockwise) against themselves on a bearing, and an internal shaft, which is offset so that it may control the movement (up or down) of an air bubble level on top of the gauge. Turning the outer knob rotates the offset shaft, thereby causing the air bubble level device to move up or down, depending upon whether the knob revolves clockwise or counterclockwise. When the air bubble has been centered, the outer knob may be locked in place with a thumb screw. The inner knob has the caster and camber dials, and it rotates, depending upon where the outer knob is moved to center the air bubble. Additionally, the adjustment gauge utilizes a spring to hold the air bubble level tight against the cam of the wheel.

Caster may be measured by moving the turn plate and "A" frame twenty degrees to the front and then twenty degrees to the rear, and utilizing the level and the caster dial of the adjustment gauge for a reading. No adjustments are made, however, until camber is measured by turning the "A" frame to zero and utilizing the level and camber dial of the gauge for a reading. As soon as caster and camber are read on one side of the vehicle, they may be read on the other side, since each side is independent of the other.

After caster and camber on both sides are read, the specifications set forth in the automobile owner's manual are compared with the readings obtained by use of the Racealigner. Adjustment of the caster or camber is then manually accomplished by the mechanic with shims (pieces of steel with a hole in them), or in some cars, with cams (offset washers). Another reading is then made to recheck the caster and camber by the same methods initially used. If caster and camber are found to be correct, toe-in is then read on the radius gauge and adjusted manually.

The items described as collets are used to replace the front wheel bearings for purposes of checking alignment, and enable the mechanic to obtain a reading from the machined surfaces of the spindle; the items described as spacer rings are used on certain models of automobiles, which have exceptionally long spindles to hold the legs of the "A" frame out.

At the trial of the present case, Mr. Bateman again was the only witness and provided the following additional testimony: He testified that each of the front wheels is replaced by the "A" frame which acts as a leveling device, supports the weight of the car in place of the wheels, and keeps each of the front spindles at the same height for accurate reading and proper adjustment. He added that the Racealigner incorporates two measuring devices—the magnetic gauge and the toe gauge. The magnetic gauge, he said, can be used without the

rest of the machine by attaching an adaptor at the end of the hub, while the radius gauge can also be used separately with the adaptor.

Bateman further testified that in providing support for the front end of the automobile, the "A" frame takes the place of a $1,000 or $2,000 rack or leveling device; that with the front wheels removed, it is far easier for the mechanic to do the alignment because the adjustments on most cars are between the wheel and frame; that the "A" frame allows the mechanic free access to the area of adjustment at all times; that in using the Racealigner, it is the adjustments that are time-consuming and not the taking of the readings; and that the Racealigner plays no part in the making of those adjustments.

The witness also testified that by utilizing various parts of the Racealigner, with the exception of the measurement devices, alignment could be accomplished by using other gauges and measurement devices; that when used with other gauges and measurement devices, the "A" frames, turn plates and other portions of the Racealigner carry the weight of the automobile, make it accessible for the mechanic to get at the adjustment, compensate for any non-level contour of the floor, and allow the use of the turn plate for leverage in turning the wheels and the steering column; and that when using other measuring devices with the Racealigner, the remaining portions of the machine perform the same functions as when used with the Racealigner gauges.

The witness also testified that the Racealigner itself does not make any adjustments; that the adjustments are made by a mechanic who relies on the Racealigner to check and recheck these adjustments to make sure they are correct; that it is impossible for a mechanic to make these adjustments with the naked eye; that if the Racealigner indicated that the wheels of a car were in proper alignment, no adjustment would be made; and that a quick test of alignment can also be accomplished by the test tool imported with the Racealigner which is used to tell if the wheel is bent.

It is in this setting that plaintiff argues (as previously indicated) that the Racealigner is a multipurpose machine whose primary purpose or function is not to take alignment readings but rather to enable the mechanic to make required adjustments when it has been determined that such work is necessary. We do not agree. On the contrary, we think that on the basis of the entire record the Racealigner does only one essential thing: it measures caster, camber and toe-in to determine whether the wheels of an automobile are in proper alignment. If the wheels are misaligned, adjustments are made with tools or devices other than the importation. The Racealigner is also used to check and recheck the accuracy of the adjustments made. If the alignment readings thus made are in conformity with the manufacturer's

recommended standards, no alignment adjustments are made. Indeed, the testimony of the witness Bateman at the first trial made clear that the primary function of the Racealigner is to measure the various angles of an automobile's front wheels to determine whether they are properly aligned. This is illustrated by the following excerpts from his testimony (R. 30–31):

Q. Mr. Bateman, is it not true that the function of the article at Bar, which is called a Racealigner, is to measure the various angles of the automobile's wheels?

A. It does.

Q. And that is its essential function, to measure angle?

A. It measures the angles, correct.

    \*      \*      \*      \*      \*      \*      \*

Q. And is it your testimony that this is the function of the article, to give you the particular reading so that subsequent to the reading you can perform the proper corrections?

A. I would say, basically, yes.

To similar effect, plaintiff's counsel, in his opening statement at the first trial, observed that the Racealigner "is an equipment mechanism \* \* \* which provides sufficient information to make it possible to align front wheels of motor vehicles." (R. 2) And as stated by the court in the *Wiley* decision (62 Cust. Ct. at 261 and 264):

\* \* \* the Racealigner is designed and constructed solely to measure the misalignment in the front wheels of an automobile. \* \* \*

    \*      \*      \*      \*      \*      \*      \*

\* \* \* the purpose of the Racealigner is to enable the mechanic to compare a vehicle's wheel alignment with the standard recommended in the owner's automobile manual \* \* \*.

In point is *Frank P. Dow Co., Inc.* v. *United States*, 60 Cust. Ct. 98, C.D. 3274 (1968), which involved the classification of certain indicators used with valve-gappers, which in turn were used in garages and service stations to measure valve clearance in automobile engines. The court upheld the classification of the indicators as non-optional measuring or checking instruments, apparatus, and machines under item 710.80 and overruled the claim for classification under item 678.50 as machines not specially provided for. In *Dow*, it is to be noted, plaintiffs claimed that the import was more than an instrument for measuring because it not only measured valve clearance but also moved the rocker-arm. As to this, the court said (60 Cust. Ct. at 101):

\* \* \* Plaintiffs' witness testified, however, that the purpose of the valve-gapper is to measure the actual valve clearance in

thousandths of an inch. It appears, therefore, that even if the valve-gapper in operation moves the rocker-arm, it does so only for the purpose of measuring the valve clearance. * * * Thus it is immaterial whether the valve-gapper moves the rocker-arm *to* measure or whether it moves the rocker-arm *and* measures, as long as its primary function is measuring. There is no indication in the testimony, or in plaintiffs' brief, that moving the rocker-arm serves any purpose other than in connection with measuring the valve clearance. * * * [3]

In the present case, similarly, it is immaterial whether the Racealigner holds the automobile off the ground, levels the automobile and moves the steering mechanism of the automobile. For there is no indication in the record that these functions serve any appreciable purpose other than in connection with measuring or checking the camber, caster and toe-in. In short, the present case has much in common with *Dow* considering that like the valve-gapper with the indicator, the Racealigner is used to measure an automobile's mechanism; measuring is its only essential function; and adjustments, if needed, are made with some other tool or device.

Plaintiff attempts to distinguish *Dow*, however, by contending that the Racealigner performs functions which are not related to measuring or checking alignment. The fact of the matter is that aside from measuring or checking, all the functions performed by the Racealigner are only subsidiary to the measuring and checking function. These subsidiary functions consist of holding the front of the automobile off the ground, leveling of the automobile, and moving the steering mechanism of the automobile. But these three functions would be of little or no value if the measuring and checking function were not performed. It is true that in holding the automobile off the ground the Racealigner could serve a purpose in enabling the mechanic to make other adjustments or repairs upon an automobile. But in view of the design of the Racealigner, coupled with the fact that other devices such as jacks, lifts and cinder blocks could perform the holding function without necessitating the removal of the wheels, the use of the Racealigner for purposes other than in conjunction with alignment would obviously be minimal.

It is also significant that if alignment adjustments are needed, they are made through use of tools and devices that are completely independent of the Racealigner. Thus, the Racealigner does not perform the function of alignment. In fact, if after the Racealigner is installed, the measurements of camber, caster and toe-in are found to conform to those specified for the particular automobile, no alignment adjustments are even made. Furthermore, it is not the use of the Race-

---

[3] Cf. *United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183 (1941).

aligner that provides the accessibility to make required adjustments but rather the removal of the wheel prior to the installation of the Racealigner that enables the mechanic to get at the adjustment points. Thus, there is no cause and effect relationship between the Racealigner and the adjustments.

Plaintiff further argues that the legislative history indicates that it was the intention of Congress to classify articles such as the imported Racealigner under provisions other than item 710.80 covering measuring and checking instruments, etc. In this connection, plaintiff asserts that item 710.80 is principally derived from paragraph 397 of the Tariff Act of 1930. It then argues that since the incorporated *Wiley* case held that identical Racealigners were not classifiable under paragraph 397, it follows that the present importations are not classifiable under the successor provision for such merchandise in the tariff schedules—i.e., item 710.80. However, we find no merit to this contention in light of the fact that the *Tariff Classification Study*, Schedule 7 (1960), p. 149, provides:

> * * * Item 710.80 would include numerous articles subject to duty at numerous rates under *widely separated provisions* in the present tariff. [Emphasis added.]

Nor do we find *The Explanatory Notes to the Brussels Nomenclature* (1955) of assistance in determining the scope of item 710.80. For while heading 90.16(II) is concerned with "Measuring and Checking Instruments, Appliances and Machines," the language and format are entirely dissimilar to the tariff schedule provisions for similar articles. The *Brussels* reference, moreover, neither explicitly nor impliedly excludes the imported merchandise from classification under item 710.80.

In view of all the foregoing, the protests are overruled. Judgment will be entered accordingly.