430

(C.D. 4312)

BRUCE DUNCAN CO., INC., A/C STAALKAT OF AMERICA, INC.
*v.* UNITED STATES

United States Customs Court, First Division

(Decided December 29, 1971)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*L. Patrick Gray, III*, Assistant Attorney General (*Susan C. Cassell*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The importations in these consolidated protests consist of so-called Staalkat egg handling machines that were exported from Holland and entered at the port of Los Angeles. The machines were classified by the government under item 710.80 of the tariff

schedules as other non-optical measuring or checking instruments, apparatus and machines not specially provided for, and assessed with duty at the rate of 15 percent.

Plaintiff challenges this assessment as erroneous and claims that the machines are properly dutiable at 11½ percent under item 666.25 as industrial machinery for preparing food. Alternatively it claims they are classifiable under item 688.40 as electrical articles, not specially provided for, which item likewise carries a rate of duty of 11½ percent. We overrule the protests.

Set out below are the provisions of the tariff schedules with which we are concerned:

Classified under:

> \* \* \* non-optical measuring or checking instruments, apparatus, and machines not specially provided for; and parts of the foregoing articles:

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

710.80    Other _____    15% ad val.

Claimed under:

> Industrial machinery for preparing and manufacturing food or drink, and parts thereof:

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

666.25    Other _____    11.5% ad val.

Claimed under alternatively:

688.40    Electrical articles, and electrical parts of articles, not specially provided for_____    11.5% ad val.

At the outset it is to be noted that the imported machines in issue here are the same as were involved in *Staalkat of America, Inc.* v. *United States*, 56 CCPA 86, C.A.D. 959 (1969), *aff'g* 59 Cust. Ct. 241, C.D. 3130, 273 F. Supp. 417 (1967), and in *Staalkat of America, Inc* v. *United States*, 54 Cust. Ct. 161, C.D. 2526 (1965). In both of those cases, the Staalkat machines were held properly classified under paragraph 353 of the Tariff Act of 1930, as modified, as articles having as an essential feature an electrical element or device, rather than under paragraph 1604 as agricultural implements, as claimed. The present case is the first involving classification of these machines under the tariff schedules.

As pointed out by our appellate court (56 CCPA at 89), the Staalkat machine has three functions. First, it separates the eggs by sorting them, by a weighing device, into various weights. Second, it provides for viewing the interior quality of the egg by a process called "flash

candling." Third, it contains a mechanism for marking each egg. To quote the appellate court (*ibid*) :

> In performing [these] functions * * * the machine employs three basic sections. The eggs are placed in the infeed section; then they are moved along through a closed area with a screen and space for electric lights where grading or candling is accomplished. The candling process involves placing each egg against a strong light in order to determine whether blood clots are present therein; whether the egg is fresh or old by observing the size of the air space within the shell and to reveal the presence of any hidden cracks. It appears that candling separates out the undergrade eggs and determines the grade of the acceptable eggs. The above steps having been taken, a conveyor takes over and carries the eggs from the candling area to a series of scales which weigh each egg, thus determining classification as to size. The egg is then ejected from the scale where an automatic arm may mark the egg if desired. From the marking point the egg rolls to a location from which it is hand-packed into cartons. The record reveals that the value of the machine's utility resides in its high degree of accuracy and the fact that it handles eggs gently, thus minimizing breakage.

Against this background, we now proceed to determine whether the Staalkat machines were properly classified by the government under item 710.80 as a non-optical measuring or checking machine. In this connection, it is settled that to be classifiable under this provision, the machine or device must have as its primary or dominant function that of measuring or checking. *Frank P. Dow Co., Inc., et al.* v. *United States*, 60 Cust. Ct. 98, C.D. 3274 (1968); *James G. Wiley Co., a/c J. R. Bateman* v. *United States*, 66 Cust. Ct. 493, C.D. 4241 (1971). On this aspect, plaintiff contends that the Staalkat machine has features that make it more than merely a measuring or checking device and that it is therefore not classifiable under item 710.80. More particularly, plaintiff argues that while one function of the Staalkat machine is to sort eggs automatically by use of mechanical scales (which plaintiff concedes to be a measuring function), this does not constitute its primary function. For, according to plaintiff, the important candling feature of the machine involves no checking function of any kind on the stated basis that it "includes only a light source and an area where the eggs are rolled over so that the interiors of the eggs can be viewed [and] [e]xamination of the eggs' interiors is done by operators, and removal of the eggs found to be unfit is also done by the operator." Additionally, plaintiff asserts that "the conveyor belt and collection table portions of these machines and the marking features involve no measuring or checking functions of any type."

In considering these arguments, we think it clear that the Staalkat machine has two primary or essential functions and one minor auxil-

iary function. Its essential functions are (1) to weigh the eggs and sort them by weight, and (2) to grade the eggs by "candling" (i.e., exposing them to light to enable detection of discoloration and other imperfections in the eggs). On the other hand, its third function—marking—is minor and auxiliary only. With respect to the nature of these functions, what this court said in the second *Staalkat* case is particularly pertinent here (59 Cust. Ct. at 253):

> It appears that this machine is designed to have and does have three functions—sorting, grading or candling, and marking. *While the marking device seems to be a minor auxiliary feature generally not used in this country,* the candling feature is one of the primary functions without which the machine cannot be used to its full potential. \* \* \* [Emphasis added.]

To similar import is the following statement of the appellate court in affirming the decision of this court in the second *Staalkat* case (56 CCPA at 94):

> \* \* \* It appears from the record that the machine is so designed to have, and that it does have, at least two essential functions necessary to attain its intended purpose. These functions are sorting and grading or candling. *The marking device appears to be a minor feature not in general use nor is it essential to the fulfillment of the machine's primary purpose.* \* \* \* [Emphasis added.]

In short, the Staalkat machine is essentially a weighing (measuring) and grading or "candling" (checking) machine. And on this latter phase, we see no merit to plaintiff's position, as we understand it, that the "candling" process is not in and of itself a checking function because it requires human sensory perception (vision) in completion of the process. Indeed, the measuring and checking instruments specifically enumerated in items 710.60–710.80, such as calculators, slide rules, protractors, calipers, etc., all require some type of human sensory participation for completion of the measuring or checking function. The point is that the Staalkat machine is no less a measuring or checking device because "candling" requires human detection of defects made visible by the machine than is a ruler (for example) which requires the user to make differentiations of distance based upon the scale on the measuring device.

Nor is there anything in the legislative history of item 710.80 that would derogate from its covering the present importations. As to this legislative history, the *Tariff Classification Study, Explanatory and Background Materials,* Schedule 7 (1960), pp. 149–50, states that: "Item 710.80 would include numerous articles subject to duty at numerous rates under widely separated provisions in the present tariff. \* \* \* [A] substantial part of these would probably be within

the scope of the basket provision for metal manufactures in paragraph 397 * * *." See also Vol. 2, the *Tariff Classification Study, Explanatory Materials* (1964), pp. 549–50. It is quite true, as noted before, that the Staalkat machines were previously held classifiable under paragraph 353 rather than under paragraph 397. But contrary to plaintiff's position, this scarcely means that Congress intended thereby to exclude such machines from the coverage of item 710.80. For as the foregoing excerpt from the *Tariff Classification Study* makes clear, item 710.80 includes not only articles previously classifiable under paragraph 397 but also numerous articles previously encompassed by other "widely separated provisions" of the tariff act.[1]

Plaintiff contends further that section 90.16(II) of the *Explanatory Notes to the Brussels Nomenclature* (1955) also supports it's position that item 710.80 was not intended to cover the Staalkat machines in controversy. However, as we pointed out in *James G. Wiley Co., a/c J. R. Bateman* v. *United States, supra*, 66 Cust. Ct. at 500, in answer to a similar contention:

> [W]e [do not] find *The Explanatory Notes to the Brussels Nomenclature* (1955) of assistance in determining the scope of item 710.80. For while heading 90.16(II) is concerned with "Measuring and Checking Instruments, Appliances and Machines," the language and format are entirely dissimilar to the tariff schedule provisions for similar articles. The *Brussels* reference, moreover, neither explicitly nor impliedly excludes the imported merchandise from classification under item 710.80.

This brings us to plaintiff's claim that the Staalkat machines are industrial machines for "preparing" food and hence classifiable under item 666.25.[2] The word "prepare"—in the tariff sense as related to food—has been judicially construed to mean that the food has been changed in character or advanced toward the condition in which it is used. *Stone & Downer Co.* v. *United States*, 17 CCPA 34, 36, T.D. 43323 (1929); *Frosted Fruit Products Co.* v. *United States*, 18 Cust. Ct. 119, C.D. 1054 (1947). Thus in *United States* v. *Conkey & Co.*, 12 Ct. Cust. Appls. 552, 555, T.D. 40783 (19255), the court said:

> "Prepared, or preserved," as used in the tariff acts ordinarily involves cooking, salting, drying, smoking, curing, or the application of some method or process whereby the fresh or natural con-

---

[1] In *James G. Wiley Co., a/c J. R. Bateman* v. *United States, supra*, 66 Cust. Ct. at 500, a similar argument was likewise rejected by the court.

[2] We discuss this claim on the assumption that item 666.25 is more specific than item 710.80. However, we neither decide nor intimate any opinion on that question. Parenthetically, it is to be added that were item 710.80 held to be more specific than item 666.25, it would be unnecessary to reach the question as to whether the imports come within the purview of item 666.25. For even if they were covered by the latter provision, item 710.80 as the more specific provision would prevail.

dition of the article is so changed as to be more or less a permanent preservation.—Habicht v. United States (1 Ct. Cust. Appls. 10; T.D. 30772). When used in the tariff sense, the word "prepared" is sometimes used synonymously with preserved, but, in a general sense, it implies that the fresh or raw material has undergone certain mechanical changes, such as cutting, slicing, grinding, mashing, mixing, etc., and usually implies that it has been advanced toward the condition in which it is used, and frequently such preparation either aids or accomplishes preservation.

And in *United States* v. *Furuya & Co.*, 7 Ct. Cust. Appls. 495, T.D. 37109 (1917), dried seaweed with nothing added to change its character, but packed in tins as a convenient method of getting the product to market, was held to be properly classifiable under the duty-free provision for crude seaweed (i.e., paragraph 552 of the Tariff Act of 1913) rather than as "[v]egetables if cut, sliced or otherwise reduced in size, or if parched or roasted, or if pickled, or packed in salt, brine, oil, or *prepared in any way*" under the provisions of paragraph 200 of the same act. [Emphasis added.] In reaching this conclusion, the court stated that "[i]t seems clear that a process which does not change the character of the seaweed in any particular, but simply dries it for the purpose of packing and transporting it in boxes like those above described, does not withdraw the article from the favor of the free-entry paragraph." *Id.* at 497.[3]

In light of these considerations, we conclude that the item 666.25 provision for industrial machinery for "preparing" food covers only that machinery which changes the character of the food or advances it toward the condition in which it is used. It does not cover a machine such as the Staalkat machine which merely processes for marketing food that is ready for consumption and does not change the character of the food or advance it toward the condition in which it is used.

The protests are overruled. Judgment will be entered accordingly.

---

[3] Outside of customs jurisprudence, the word "prepared" in relation to food has been defined as "to make ready for eating." *National Amusement Co.* v. *Wisconsin Department of Taxation*, 163 N.W. 2d 625, 630, 41 Wis. 2d 261 (1969) ; *Bertera's Hopewell Foodland, Inc.* v. *Masters*, 236 A. 2d 197, 207, 428 Pa. 20 (1967) ; *People* v. *Wolen*, 291 N.Y.S. 665, 666, 161 Misc. 286 (1936).