### SABRITAS, S.A. de C.V. and Frito–Lay, Inc., Plaintiffs,

v.

### UNITED STATES, Defendant.

**Slip Op. 98–14.**
**Court No. 93–12–00808.**

United States Court of International Trade.

Feb. 20, 1998.

Neville, Peterson & Williams (John M. Peterson, George W. Thompson, Margaret R. Polito and Arthur K. Purcell) for plaintiffs.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department·of Justice (Aimee Lee); of counsel: Mitra Hormozi, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, for defendant.

## OPINION

TSOUCALAS, Senior Judge:

This is a consolidated action concerning the proper tariff classification of two edible consumer items: (1) taco shells; and (2) *Munchos* potato crisps. Both the taco shells and *Munchos* were imported in their final form from Mexico into the United States through California.

Plaintiffs, Sabritas, S.A. de C.V. and Frito–Lay, Inc. (collectively "Frito–Lay"),[1] challenge the United States Customs Service's ("Customs") classification of its import taco shells and *Munchos* potato crisps as "other bakers' wares: other: other" under section 1905.90.90 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1992) at a duty rate of 10% *ad valorem*. Frito–Lay contends its import taco shells are properly classified as "bread, pastry, cakes, biscuits and similar baked products" under HTSUS 1905.90.10, which carries duty-free status. Plaintiff further claims its *Munchos* are properly classified as "potato chips" under

HTSUS A2005.20.20 or, alternatively, as "Other vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen: potatoes: other" under HTSUS A2005.20.70. According to Frito–Lay, its *Munchos* meet the requirements of the Generalized System of Preferences ("GSP") and, therefore, are entitled to duty-free treatment.

Frito–Lay timely protested the liquidation of the subject entries under HTSUS 1905.90.90. Customs denied the protests and the two actions involving the taco shells and *Munchos* were consolidated for trial. Trial was held on the classification of both articles on December 9, 1997. The Court has jurisdiction over this matter under 28 U.S.C. § 1581(a) (1994).

### Background

The taco shells at issue are produced by a process that first involves the creation of "masa," a mixture of coarse corn flour and water. The masa is hydrated to a level of approximately 50% water content, plus or minus one percent. Hydration is a process whereby moisture thoroughly penetrates each flour ·particle causing it to. swell. Following hydration, the masa is transported by conveyer to a sheeter device, which forms the masa into a thin sheet. A roll cutter then cuts the sheet into the circular shape of a tortilla. ·The wet circular pieces are subsequently moved to a second conveyor, which brings them to an oven where they are baked at 560 degrees Fahrenheit for approximately 34 seconds. During baking, starch gellatinization occurs, making the still-pliable taco shells edible and decreasing their moisture to 30%. Upon leaving the oven,. the taco shells are bent into a "U" shape, ensuring a mouth opening at the top of the shell of between one inch and one and a quarter inch. Finally, the shells are fried in vegetable oil for approximately 24 seconds at 360 degrees Fahrenheit, decreasing their moisture level to 5% and increasing their oil content to 30%. This process results in the creation of a hardened shell. *See* Tr. 33–41; 125–28; *Processing Guide for Taco Bell Products*, Pl.'s Conf. Ex.

---

1. At the time this action commenced, Frito–Lay owned a controlling interest in its Mexican affili-
 ate, Sabritas. Today, Frito–Lay owns 100% of Sabritas.

2; *Textbook Flowchart and Graphics*, Def.'s Ex. D (description of taco shell commercial production process). The finished taco shells are then primarily sold to Taco Bell chain and other Mexican restaurants, where they are filled with meats, cheeses and vegetables, creating an item known in its entirety as a "hard taco." *See* Tr. 45; 133.

*Munchos* potato crisps are a fabricated potato snack primarily produced from dehydrated potato flakes, rather than from whole sliced potatoes. Frito–Lay combines several ingredients in the United States in the following approximate proportions to create the batter for a uniform circular article known as a "pellet": 65% dehydrated potato flakes; 25½% corn meal; 8% potato starch; one percent yeast; and a half percent salt. This batter is comprised of up to 25% re-ground dough from previously broken *Munchos* crisps. Once the batter is mixed, the resulting dough is sheeted, cut into pellets and baked at low temperature to dry. The baking process reduces the moisture content to 10–15%. *See* Tr. 70–77; *Applied Technical Training, Munchos Crispy Potato Snacks: Module I—Pellet Preparation Raw Materials* (*"Pellet Preparation"*), Pl.'s Conf. Ex. 8.

Following baking, the pellets are exported to Mexico, where they are fried for between 11 and 13 seconds at approximately 380 degrees Fahrenheit in a mixture consisting of hydrogenated cottonseed oil, non-winterized direct process soybean oil and partially hydrogenated cottonseed/soybean oil. The frying process causes the pellets to absorb the cooking oil, thereby swelling in size and decreasing in moisture content to 2%. The final result is the creation of potato crisps that are largely uniform in size, color, shape and texture. *Munchos* potato crisps are packaged in foil bags and sold in supermarkets, convenience stores and other similar retail outlets across the United States. *See* Tr. 77–78; *Applied Technical Training, Munchos Crispy Potato Snacks: Module VII—Pellet Frying* (*"Pellet Frying"*), Pl.'s Conf. Ex. 9.

The HTSUS sections relevant to the Court's discussion are set forth below:

| | |
|---|---|
| 1905 | Bread, pastry, cakes, biscuits and other bakers' wares, whether or not containing cocoa; communion wafers, empty capsules of a kind suitable for pharmaceutical use, sealing wafers, rice paper and similar products: |
| | * * * |
| 1905.90 | Other: |
| 1905.90.10 | Bread, pastry, cakes, biscuits and similar baked products, .......... Free |
| 1905.90.90 | Other............ 10% ad valorem |
| | * * * |
| 2005 | Other vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen: |
| | * * * |
| 2005.20 | Potatoes: |
| 2005.20.20 | Potato Chips ...................... ........ 10% ad valorem [GSP Free] |
| 2005.20.60 | Other .. 10% ad valorem [GSP Free] |

### Discussion

The issue of whether an imported article has been classified under an appropriate tariff provision entails a two-step process: (1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the article comes within the description of such terms as properly construed. *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed.Cir.1994). The first step is a question of law, whereas the second is a question of fact. *See Universal Elecs., Inc. v. United States*, 112 F.3d 488, 491 (Fed.Cir.1997). Customs' classification is assumed by statute to be correct and plaintiffs bear the burden of showing otherwise. *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed.Cir.1994) (citing 28 U.S.C. § 2639(a)(1)). However, this presumption extends only to Customs' factual findings, and not its interpretation of relevant law. *See Rollerblade, Inc. v. United States*, 112 F.3d 481, 484 (Fed.Cir.1997); *Goodman Mfg., L.P. v. United States*, 69 F.3d 505, 508 (Fed.Cir.1995).

Pursuant to 28 U.S.C. § 2640(a), Customs' classification decision is subject to *de novo* review. The Court must determine "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed.Cir.1984). The definition and scope of terms in a provision of the HTSUS is to be determined by the wording of the statute and any relative section or chapter notes. Gen.

R. Interp. 1, HTSUS; *Amity Leather Co. v. United States,* 20 CIT ——, ——, 939 F.Supp. 891, 895 (1996). The language of a statute is determinative unless legislative intent is clearly in contrast. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Lynteq, Inc. v. United States,* 976 F.2d 693, 696 (Fed.Cir.1992). However, if a tariff term is not clearly defined by the HTSUS, and if legislative history is not determinative of its meaning, its correct meaning is resolved by ascertaining its common and commercial meaning. *Mita Copystar,* 21 F.3d at 1082; *see also Amity Leather,* 20 CIT at ——, 939 F.Supp. at 894. To determine the common meaning of a tariff term, the Court may utilize standard dictionaries and scientific authorities, as well as its own understanding of the term. *Lynteq,* 976 F.2d at 697. The Court may also consider the testimony of credible witnesses as an aid in its understanding, although such testimony is not dispositive. *See Apple Computer, Inc. v. United States,* 14 CIT 719, 724, 749 F.Supp. 1142, 1146–47 (1990); *Audiovox Corp. v. United States,* 1 CIT 136, 140 (1981).

 In its determination of the definition of tariff terms, the Court may also utilize the Explanatory Notes. Explanatory Notes, which are published by the World Customs Organization (formerly known as the Customs Co-operation Council), provide guidance in interpreting the language of the HTSUS. *See Bausch & Lomb, Inc. v. United States,* 21 CIT ——, ——, 957 F.Supp. 281, 288 (1997). Although not legally binding on the United States, the Explanatory Notes generally indicate the "proper interpretation" of provisions within the HTSUS. *Lynteq,* 976 F.2d at 699 (citing H.R. Conf. Rep. No. 100–576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582); *see also Marubeni Am. Corp. v. United States,* 35 F.3d 530, 535 n. 3 (Fed.Cir.1994) (stating Explanatory Notes, while not dispositive or binding, are instructive). Additionally, in determining whether an item is properly classified under a particular heading in the HTSUS, the Explanatory Notes are persuasive authority for the Court when they specifically include or exclude an item from a tariff heading. *See, e.g., Bausch & Lomb,* 21 CIT at ——, 957 F.Supp. at 288.

**1. Taco Shells**

Frito–Lay contends its taco shells are not properly classified as other bakers' wares because they are more specifically provided for as bread or, alternatively, as "biscuits and similar baked products" under HTSUS 1905.90.10. Customs disagrees with plaintiff, alleging, mostly through testimonial evidence, that the frying of taco shells necessarily removes them from classification as either bread or biscuits and similar baked products.

 As a preliminary matter, the Court is unpersuaded by Frito–Lay's alternative contention that its taco shells may be properly categorized as biscuits and similar baked products. Biscuits are defined as follows: "In American usage the name refers to a kind of small hotbread, tender and flaky, and generally raised with baking powder or soda." **L. Patrick Coyle, The World Encyclopedia of Food** 77 (1982) ("**Encyclopedia of Food**"). The taco shells at issue clearly do not fall under this description, as they are neither tender and flaky nor raised. Further, cornmeal-based taco shells differ significantly in their ingredients from those of biscuits. *See* **The Oxford English Dictionary** 221 (2d ed.1989) (stating that "[t]he essential ingredients [of biscuits] are flour and water, or milk, without leaven; but confectionary and fancy biscuits are very variously composed and flavoured"); *see also United States v. Dunlop & Ward,* 6 U.S. Cust.App. 278, 280, T.D. 35,017 (CCPA 1915) (in classifying shortbread as a biscuit, the court stated that, in the United States, the term biscuit is used to describe either a soft, unsweetened bread or a hard, dry, flat cake made of flour and water or milk); Tr. 169–71 (testimony that taco shells are not biscuits, pastry or cake).

 An *eo nomine* provision, such as 1905.90.10, includes all forms of the named article, in this case bread. *See, e.g., National Advanced Sys. v. United States,* 26 F.3d 1107, 1111 (Fed.Cir.1994). As bread is not specifically defined in the HTSUS or in the relevant legislative history, it is necessary for the Court to determine, as a matter of law,

the common and commercial meaning of the term bread to decide whether Frito–Lay's taco shells can be classified as such.

■ The Court begins its analysis by noting that tortillas are unquestionably commonly and commercially accepted as bread in the United States. **John F. Mariani, The Dictionary of American Food & Drink** 53–54 (1983) evidences this, stating as follows:

> **bread.** One of the world's basic foods, made from flour and water, often with the addition of yeast, salt, and other ingredients. Shaped into loaves, rolls, flat cakes, or rings, bread is one of man's earliest foods....
>
> The bread of the American Indians was based on cornmeal and included a wide variety of preparations.... The TORTILLA, common still in Mexican–American restaurants, was originally an Indian cornmeal bread.

Another source notes that tortillas are a "traditional bread of Mexico, enthusiastically adopted in parts of the Southwest [United States]." **Jonathan Bartlett, The Cook's Dictionary and Culinary Reference** 462 (1996) ("Cook's Dictionary"). Further, all three witnesses who testified at trial, including Customs' expert, reinforced this conclusion. *See* Tr. 42–43, 58; 132; 222. Because a taco shell is nothing more than a fried and shaped corn tortilla, the question that remains is whether the additional process of frying, necessary to create a hard taco shell from a tortilla, removes the taco shell from the common and commercial meaning of bread.

Customs maintains that Frito–Lay bases its contention on an intermediate article, the tortilla, and argues that frying baked tortillas substantially transforms them into a different article of commerce such that they are removed from the realm of bread. Indeed, Customs' expert, food scientist Dr. Nicholas Pintauro, defined bread in the following narrow manner:

Bread is a product that is formulated with a cereal grain that's in a flour form, with other ingredients such as shortening, salt, baking powder or a leavening agent and it is prepared as a dough and that dough has to be treated, which we call kneading so that you could develop the protein that's in the cereal portion of that dough so that the protein is in the form that would encapsulate the gas that's generated by the leavening agent so that you get a rise out of the dough and then at the proper time, in the form of a loaf, that dough is baked.

Tr. 164–65. Dr. Pintauro's definition necessarily precludes any unleavened or fried products from falling within the common and commercial meaning of bread. Nothing could be further from the truth.

Evidence was introduced at trial demonstrating that the tortilla undergoes certain changes when fried. Namely, as Dr. Pintauro testified, and Frito–Lay's witness admitted, the introduction of oil and high temperature necessary to create a hard taco shell from a tortilla alters the flavor, color and texture of the original tortilla. *See* Tr. 212–13; 99; 137. Nevertheless, relying on the testimony presented at trial and, more importantly, on several definitions and descriptions in food dictionaries and treatises, the Court concludes that the common and commercial meaning of bread encompasses flat, fried bread and, therefore, the taco shells at issue.[2]

First, **Sharon T. Herbst, Barron's Cooking Guide: Food Lover's Companion** 49 (1990) (emphasis added), recognizes that a bread may be fried, as it defines bread as a "staple ... made from flour, water (or other liquid) and usually a LEAVENER [that] can be baked ... fried or steamed." The Court also deems it exceptionally significant that two recognized bread treatises devote entire chapters to fried breads. *See* **Judith Jones, The Book of Bread** (1982) & **Dolores Casel-**

2. The Court is unpersuaded by defendant's testimonial and photographic evidence purporting to demonstrate that the taco shells at issue are not bread because they were not found in the "bread aisle" at a supermarket Dr. Pintauro visited. First, a single outlet does not serve as a model for all merchandising. Further, even Dr. Pintauro conceded that breads are located in various supermarket sections. *See* Tr. 230–33. For instance, the ethnic food, deli, bakery and frozen food sections may contain bread in addition to the conventional bread aisle that typically contains leavened white and other packaged bread loaves. *See id.*

la, A World of Breads (1966). Moreover, the Court is persuaded by a recent book entirely devoted to flat breads, **Jeffrey Alford & Naomi Duguid, Flatbreads and Flavors** 1 (1995), which states that flatbreads: (1) are the world's oldest breads; (2) can be made from almost every grain imaginable, including corn; and (3) can be oven-baked, grilled, fried, steamed, or even baked in hot sand. In addition, plaintiff's expert, Dr. Robert Brown, testified that bread is produced from a variety of grains in the United States, including wheat, barley, rye, corn and oats, and that after the grain is mixed into a dough, it can either be baked or fried. Tr. 58; *see also* Tr. 131. As taco shells are made from corn flour and ultimately fried, they comfortably fall within any of these definitions of bread.

Further, as Dr. Brown testified, the post-baking process of frying does not affect the use of taco shells as bread. Tr. 41 (testifying that frying is a surface phenomenon creating crispness and decreasing moisture content, but does not "undo" previous baking); *see also* Tr. 134 (stating that a tortilla is fried to "make it rigid enough to hold the filling"). Despite Dr. Pintauro's testimony distinguishing taco shells from tortillas because tortillas "could be used as a bread, as a wrapper or what you would call a sandwich" (Tr. 223), the evidence before the Court attests that taco shells in the United States are used in primarily the same way as conventional American white bread. Indeed, the **Sunset Mexican Cook Book** 17 (3d ed.1994), discusses the expansive use of different types of tortillas, including fried tortillas:

> Mexico's distinctive flat bread, a tortilla can be stacked, rolled, folded, torn, cut, or eaten as is. It's delectable soft or fried, toasted or baked. It stores well and can be made ahead and reheated. A testament to the ingenuity of the tortilla is its long history. For many centuries, it has continued to be the mainstay of the Mexican diet.

While the evidence indicates that they may be eaten alone, taco shells are predominantly used as other conventional American bread: to hold meats, vegetables, cheeses and condiments and be consumed in a final sandwich. *See* **Nancy Backas,** *The Inside Story: Mexican Fillings,* **Restaurants and Institutions** 106 (Mar. 21, 1990) ("*Tacos,* as we know them in the United States, are tortillas that have been folded over, fried crisp, and filled with ground or shredded meat, shredded lettuce, cheese, green chilies, tomato and sauce."); **Webster's Third New International Dictionary** 2326 (1993) (defining a taco as "a sandwich made of a tortilla rolled up with or folded over a filling and usu. fried"); *see also* Tr. 129 (testimony describing how a hard taco shell is used as a base and filled with various ingredients, including meat, cheese, sauce, lettuce and tomato).

To contend that the common and commercial meaning of bread is limited to baked leavened (or even unleavened) products ignores the reality that flat, fried, usually ethnic breads exist in the United States market and are generally accepted as forms of bread. As Dr. Pintauro noted on cross-examination, "ethnic bread is bread. Period." Tr. 236; *see also* Tr. 132 (testimony that tortillas, of which hard taco shells are a type, are consumed throughout the United States, but primarily in the south and southwest); *Atwood–Stone Co. v. United States,* 5 Ct. Cust.App. 472, 474 (CCPA 1914) ("The term 'bread' ... is broad enough to cover all articles of food made from the flour or meal of grain, whether it will 'raise' or not."). The taco shells at issue, in particular, are not only found in obscure Mexican restaurants, but also on grocery store shelves and in the world's largest Mexican food chain, Taco Bell, which operates outlets across the United States. Tr. 45–46; 132–33.

Contrary to Customs' argument, therefore, the Court finds that the hard, flat, corn-based taco shells at issue are not "bread of *de minimis* commercial significance" or an "ancient or obscure product" but, rather, articles that are commonly and commercially known as bread in the United States.[3] Con-

---

3. Frito–Lay introduced certain evidence regarding the classification of taco shells in the U.S. Department of Agriculture school lunch program within the category of "Grains/Breads." The

Court concludes that this evidence is unpersuasive. First, under the title, it is conceivable that taco shells may be considered by the drafters to be a type of grain (from which bread is made),

sequently, in light of the evidence presented in this case, the hard taco shells at issue are properly classified under HTSUS 1905.90.10 because they are flat, fried bread used to hold other edible articles in a complete meal or to be eaten alone.

It is true that taco shells also fall within the provision for bakers' wares, as they may generally be described as baked goods. However, the competing provision also encompassing the article at issue is the *eo nomine* provision for bread, which more specifically provides for taco shells. Hence, in accordance with General Rule of Interpretation 3(a), the Court concludes that the taco shells are properly classified under HTSUS 1905.90.10.

### 2. *Munchos*

██ Frito–Lay contends its *Munchos* are properly classified under HTSUS A2005.20.20 because they are fabricated, as opposed to natural, potato chips, and so, are a type of potato chips. Plaintiff further alleges that, even if its *Munchos* can be classified as other bakers' wares, subheading A2005.20.20 more specifically provides for the imports than subheading 1905.90.90. In the alternative, Frito–Lay claims its *Munchos* are "Other vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen: potatoes: other" under HTSUS A2005.20.70.

In opposition, Customs contends *Munchos* are not prepared or preserved potatoes, and so, cannot be classified under HTSUS A2005. Customs further points to several physical characteristics that differentiate *Munchos* from natural potato chips, including bulk density, color, texture and flavor. Finally, Customs claims that the process of producing *Munchos*, as well as the ingredient composition and merchandising of *Munchos*, differ greatly from those of potato chips.

Section A2005 encompasses "Other vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen." Within this section, plaintiff claims its *Munchos* are classifiable as either potato chips or otherwise prepared or preserved potatoes. In the tariff acts, the court has acknowledged that "prepared" is sometimes used synonymously with "preserved" but that preparation implies that raw material has undergone changes that frequently aid or accomplish preservation. *See Bruce Duncan Co. v. United States*, 67 Cust. Ct. 430, 434, C.D. 4312 (1971). In *Stein, Hirsch & Co. v. United States*, 6 U.S.Cust.App. 154, 155–56, T.D. 35,397 (CCPA 1915), the court had to determine whether potatoes, finely ground into flour, were "potatoes, prepared." The court stated that the salient factors in its affirmative determination were that the article had not acquired a new name, use or character; no chemical change in the raw material was effected in the production process; and the final article was of the same essential nature, serving one of the same purposes, as the potato. *Id.; see also Nestle Refrigerated Food Co. v. United States*, 18 CIT 661, 677 (1994) (concluding that a tomato product consisting of tomato pieces, tomato puree, basil, citric acid and salt could not be classified as tomatoes prepared or preserved because it was more than tomatoes in pieces). In accordance with this reasoning, *Munchos* are at least excluded from plaintiff's alternative basket provision for prepared or preserved potatoes because their name, character and chemical composition are indisputably distinct from those of potatoes in their raw form. *Munchos* are not raw potatoes in an altered form; rather, they are crispy snacks made predominantly from dehydrated potato flakes with the addition of cornmeal and other ingredients. Nevertheless, the Court will discuss whether *Munchos* fall under the *eo nomine* provision for potato chips.

██ As previously noted, an *eo nomine* provision such as A2005.20.20 includes all

---

and not a type of bread. *See The Grains/Breads Requirement for the Food–Based Menu Planning Alternatives in the Child Nutrition Programs*, Pl.'s Ex. 5 (*"USDA Grains/Breads Requirements "*); Tr. 102. Further, it appears that the intention of these guidelines is to establish items that fulfill the requirements of the nutrients contained in

grain and bread, and not to create inflexible definitions. *See* Tr. 60; 251. Moreover, this same category includes other items that are unquestionably not breads, such as macaroni and noodle products and ready-to-eat breakfast cereals. *See USDA Grains/Breads Requirements*, Pl.'s Ex. 5; Tr. 102–03.

forms of the named article. *See National Advanced Sys.*, 26 F.3d at 1111. The Court adds that, absent definite legislative history indicating a contrary intent, such an unqualified provision for a natural product also covers synthetically produced forms of the named article. *See Rhone–Poulenc, Inc. v. United States*, 11 CIT 466 (1987) (the court concluded that a synthetic version of silica, and not only natural mineral silica, are to be classified under the *eo nomine* classification for silica). Further, as plaintiff notes, an *eo nomine* provision, such as "potato chips" in this case, is always more specific than a basket provision, such as "other bakers' wares" in this case. *See, e.g., Travenol Labs., Inc. v. United States*, 67 C.C.P.A. 71, 622 F.2d 1027, 1029 (Cust & Pat.App.1980).

That being said, it is important to note that this case is ostensibly distinguishable from *Rhone–Poulenc*, to which plaintiff cites. The court in that case accepted that "the synthetic products at issue ha[d] the essential characteristics of [the] natural" product before concluding that the synthetic version was properly classified under the *eo nomine* provision for the natural product. 11 CIT at 467. In contrast, the characteristics of *Munchos* significantly diverge in several significant respects from those of potato chips.

Potato chips are consistently defined in food and non-food related sources as snack articles produced from thin slices of whole potatoes that are fried. For instance, **Webster's Third New International Dictionary** at 1774, defines a potato chip as "a thin slice of raw white potato fried crisp in deep fat." Similarly, the **Cook's Dictionary** at 369, defines potato chips in the following manner:

> A typically American snack food consisting of paper-thin slices of potato soaked in cold water, then deep-fried, dried, and salted.... Potato chips are available plain or rippled and augmented with any number of flavorings.

*See also* **Encyclopedia of Food** at 532. Consequently, according to these sources, a final potato chip has the necessary characteristics of being: (1) comprised of a thin slice of whole raw potato; and (2) produced by deep-frying. These simple characteristics differ significantly from those of *Munchos*.

First, *Munchos* are composed of several ingredients, including dehydrated potato flakes, corn meal and potato starch, while potato chips are produced entirely from sliced raw whole potatoes. The following testimony from Frito–Lay's own expert witness attests to the significance of this difference:

> Q [Mr. John M. Peterson] Do you have a judgment as to the meaning of the term "potato chip" as it is used in the United States commerce today that you can share with the Court?
>
> A [Dr. Robert Brown] Yes, I do.
>
> Q Can you tell us what that definition is?
>
> A The definition I use for potato chips is essentially what that legal definition tells me and that tells me that the actual—*to label something as a potato chip, it means it comes from a whole slice of a potato. Potato crisps is a definition of a fabricated potato chip. Whereas, you could call the Munchos a potato chip, it would have to be further described as coming from dehydrated potatoes* ....

Tr. 90–91 (emphasis added).

Further, while *Munchos* are ultimately deep-fried, their process of production is far more complex than that of natural potato chips. The manufacture of *Munchos* involves the creation of a batter from the various ingredients to make pellets by sheeting, cutting and baking them before finally frying. *See generally Pellet Preparation*, Pl.'s Conf. Ex. 8 & *Pellet Frying*, Pl.'s Conf. Ex. 9; *see also* Tr. 71–78. This is in stark contrast to the simple frying procedure of whole raw potato slices to manufacture natural potato chips. *See, e.g., Frito–Lay Internet Cite, "From Potatoes to Chips"*, Def.'s Ex. B. It is also significant that entirely different equipment, except for perhaps the fryers, is employed to produce the two products. Tr. 181–82; *Compare Pellet Preparation*, Pl.'s Conf. Ex. 8, at 12–14 *with Processing Guide for Taco Bell Products*, Pl.'s Conf. Ex. 2, at 2.

The physical characteristics of *Munchos* in their final form also set them apart from conventional, natural potato chips. While the

Court acknowledges that potato chips themselves vary marginally in their physical characteristics by their brand or flavor (such as barbeque or sour cream and onion), the evidence at trial revealed certain glaring differences between the characteristics of *Munchos* and potato chips. *Munchos* generally have a high bulk density, are largely uniform in color, size and weight, and exhibit a coarse, slightly puffed and strong texture. *See Comparison Chart—Munchos and Potato Chips (Prepared by Dr. Nicholas Pintauro)*, Def.'s Ex. E (*"Comparison Chart"*); *see also* Tr. 183–86. In contrast, potato chips have a low bulk density, vary widely from each other in color, size and weight and exhibit an exceptionally fragile and brittle texture, as well as an unmistakably robust potato taste.[4] *See Comparison Chart*, Def.'s Ex. E; *see also* Tr. 183–86.

Finally, Frito–Lay utilizes separate training manuals for the production of potato chips and for the production of *Munchos*. *See Potato Chip Manuals*, Def.'s Conf. Exs. U–1 through U–11 & *Munchos Manual*, Def.'s Conf. Ex. U–12; *see also* Tr. 108–12. Additionally, the potato chip production manuals state that Frito–Lay produces only two potato chip products, *Lays* and *Ruffles*. *See Potato Chip Manuals*, Def.'s Conf. Ex. U–1, at 3; Tr. 108.

Hence, upon consideration of the proffered testimonial and documentary evidence and based on the Court's *in camera* inspection of the subject potato crisps, the Court agrees with defendant that *Munchos* are not a form of potato chips and are, therefore, removed from the scope of the *eo nomine* provision for potato chips. As Dr. Brown stated, fresh potatoes are only harvested from late February to early November (Tr. 82), and so, Frito–Lay must use stored potatoes in producing potato chips for much of the year. Tr. 72; 81–82. Stored potatoes shrink as they lose moisture and their starch is converted to sugar, resulting in smaller, lighter colored and blander tasting potato chips that take longer to cook. Tr. 82–83. The benefit of potato crisps is to permit a prolonged, year-round storage time of pellets with which to produce a potato-based snack product. Tr. 72. Considering this in conjunction with the characteristics discussed above, *Munchos* are, at best, a dietary alternative to potato chips.[5]

*Munchos* may be classified as bakers' wares because they may be described generally as baked goods. Indeed, Explanatory

---

4. The Court finds the testimony and supporting exhibits regarding the merchandising of *Munchos* inconsistent and unpersuasive. According to Dr. Pintauro's testimony, *Munchos* are merchandised in a way that distinguishes them from natural potato chips. The exhibits depicting the snack food display shelves at a single supermarket Dr. Pintauro visited purport to demonstrate that the *Munchos* are positioned among nonpotato chip snacks such as pretzels, tortilla chips, fabricated multi-grain snacks, popcorn and fried onion-flavored rings. *See Supermarket Pictures (Board C)*, Pl.'s Ex. A–3. Customs further supports its contention by referring to a particular supermarket rack named "Frito–Lay Potato Chips," which notably does not contain *Munchos*.

First, while the *Munchos* are admittedly placed among nonpotato chip snack items, they are positioned virtually adjacent to potato chips. Further, the supermarket section containing all the snack food items named above is labeled "Chips," adding to the linguistic confusion. Also, the product that most approximately approaches *Munchos* in composition and process of production, *Pringles* potato crisps, is located in a separate section of the supermarket, labeled "Snacks." Moreover, this one supermarket can-

not serve as the absolute or proper model of merchandising for *Munchos* across the United States.

5. The Food and Drug Administration ("FDA") has allowed the use of the term "potato chips" for products made from either whole potatoes or dehydrated potatoes, as long as the dehydrated potato product is accompanied with a prominent declaration to this effect. The FDA's determination regarding the use of the term "potato chips" has no bearing on the Court's decision in this case.

First, the FDA's practice does not affect the definition of a term for classification purposes, as the definition of a term in a statute or regulation dealing with non-tariff matters does not determine the common and commercial meaning of that term for tariff purposes. *See Nestle*, 18 CIT at 664. Further, this point is not exceptionally powerful in this case as, despite the FDA permission, *Munchos* and similar products have long been advertised and sold as a distinct product, "potato crisps." *See, e.g.,* Exhs. I (*Munchos*) & O (*Pringles*). Finally, if the FDA's position is indicative of anything, it is the need for a prominent declaration to prevent misleading consumers as to the actual composition of potato crisps.

Note 15 to HTSUS Section IV, 19.05, provides strong support for classifying *Munchos* under HTSUS 1905, stating that the section covers:

**Crisp savoury food products,** for example those made from a dough based on maize (corn) meal with the addition of a flavouring consisting of a mixture of cheese, monosodium glutamate and salt, fried in vegetable oil, ready for consumption.

Unlike the taco shells, therefore, based on the foregoing analysis and the Explanatory Note discussed above, as well as the Court's own independent examination of the HTSUS, the Court finds that *Munchos* are properly classified under HTSUS 1905.90.90 and that there is no *eo nomine* provision that more specifically provides for *Munchos*.

Having determined that *Munchos* should not be classified under Chapter 20, the Court need not decide whether they are entitled to duty-free treatment under the GSP.

### Conclusion

Consequently, the Court concludes that Customs properly classified plaintiff's import *Munchos* potato crisps under HTSUS 1905.90.90. The Court also concludes that plaintiff's import taco shells are properly classified as bread under HTSUS 1905.90.10 and orders Customs to reliquidate these items accordingly.

### JUDGMENT