**Slip Op. 04-25**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                          :
CARGILL, INCORPORATED,                    :
                                          :
          Plaintiff,                      :
                                          :
          v.                              :          Court No.
                                          :          00-04-00189
UNITED STATES,                            :
                                          :
          Defendant.                      :
                                          :
_____:

    Plaintiff, Cargill, Incorporated ("Cargill") moves pursuant to USCIT R. 56 for summary judgment on the ground that there is no genuine issue as to any material facts. Defendant cross-moves for summary judgment seeking an order dismissing the case.

    **Held:** Plaintiff's motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted.

Dated: March 18, 2004

    Neville Peterson LLP (Michael K. Tomenga, George W. Thompson and Julia S. Padierna-Peralta) for Cargill, plaintiff.

    Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Mikki Graves Walser, Commercial Litigation Branch, Civil Division, United States Department of Justice; of counsel, Beth C. Brotman, Office of the Assistant Chief Counsel, United States Bureau of Customs and Border Protection, for the United States, defendant.

**OPINION**

    **TSOUCALAS, Senior Judge:** Plaintiff, Cargill, Incorporated ("Cargill") moves pursuant to USCIT R. 56 for summary judgment on the ground that there is no genuine issue as to any material facts.

Defendant cross-moves for summary judgment seeking an order dismissing the case.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a) (2000).

## STANDARD OF REVIEW

On a motion for summary judgment, the Court must determine whether there are any genuine issues of fact that are material to the resolution of the action. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if it might affect the outcome of the suit under the governing law. See id. Accordingly, the Court may not decide or try factual issues upon a motion for summary judgment. See Phone-Mate, Inc. v. United States, 12 CIT 575, 577, 690 F. Supp. 1048, 1050 (1988). When genuine issues of material fact are not in dispute, summary judgment is appropriate if a moving party is entitled to judgment as a matter of law. See USCIT R. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## DISCUSSION

### I.   Background

The merchandise subject to this action was entered in the port of Chicago, Illinois between March 19, 1996, and April 26, 1996.

See Summons. The subject merchandise involves thirteen consumption entries covering merchandise identified as "deodorizer distillate" on the commercial invoices. See Mem. Supp. Def.'s Opp.'n Pl.'s Mot. Summ. J. & Supp. Def.'s Cross-Mot. Summ. J. ("Customs' Mem.") at 2. The subject merchandise is a residual by-product attained during the deodorization process of edible vegetable oils, which removes unwanted constituents during refining. See Compl. ¶ 7. The United States Customs Service[1] ("Customs") classified the imported merchandise under heading 3824 of the United States Harmonized Tariff Schedule ("HTSUS"), subject to a duty rate of 3 cents per kilogram, plus 12.2 percent ad valorem. See id. ¶ 12. Plaintiff filed a timely protest and application for further review with Customs challenging the classification of the subject merchandise under HTSUS 3824.90.28. See id. ¶ 13. Cargill requested reliquidation of the entries under subheading 3823.19.40, which carries a duty rate of 4.4 percent ad valorem. See id. On July 29, 1999, Customs issued Headquarters Ruling Letter ("HRL") 960311, holding that deodorizer distillate imported with a mixture of fatty acids that contains 5 percent or more of tocopherols is classifiable under subheading 3824.90.28, while a mixture of fatty acids containing less than 5 percent by weight of tocopherols is

---

[1] The United States Customs Service was renamed the Bureau of Customs and Border Protection of the Department of Homeland Security, effective March 1, 2003. See H.R. Doc. No. 108-32 (2003).

classified under 3824.90.9050.  <u>See</u> Customs' Mem. Ex. D at 3.   In reaching its decision, Customs states: "We agree [with Cargill's opinion that] the deodorizer distillate is not <u>prima facie</u> classified in heading 3823, and it is not classified in heading 3823 by virtue of [Rule 1 of the General Rules of Interpretation, HTSUS ('GRI 1')].   However, we disagree with the protestant's opinion concerning heading 3824."  <u>Id.</u> at 2.  Accordingly, Customs found that since the deodorizer distillate is not classifiable under heading 3823, by virtue of GRI 1, and is not elsewhere specified or included in the tariff, then pursuant to GRI 1, the merchandise is classifiable under heading 3824.  <u>See</u> <u>id.</u> at 2-3.

The HTSUS sections relevant to the Court's discussion are set forth below:

> 3823 Industrial monocarboxylic fatty acids; acid oils
>      from refining; industrial fatty alcohols:
>
>          Industrial monocarboxylic fatty acids; acid
>          oils from refining:
>
> 3823.11.00          Stearic acid
>
> 3823.12.00          Oleic acid
>
> 3823.13.00          Tall oil fatty acids
>
> 3823.19             Other:
>
> 3823.19.20                  Derived from coconut, palm-
>                             kernel or palm oil
>
> 3823.19.40                  Other . . .    4.4%
>
> . . . .

3824 Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products) not elsewhere specified or included; residual products of the chemical or allied industries, not elsewhere specified of included:

. . . .

3824.90        Other:
                        Other:
                                    Mixtures containing 5 percent or more by weight of one or more aromatic or modified aromatic substances:

. . . .

3824.90.28                              Other . . . 3¢/kg + 12.2%


## II.  Contentions of the Parties

### A.  Cargill's Contentions

Cargill complains that Customs wrongly liquidated or reliquidated the subject merchandise under subheading 3824.90.28 instead of the more specific subheading 3823.19.40. See Pl.'s Mem. Supp. Mot. Summ. J. ("Cargill's Mem.") at 1-32. Cargill argues that, by applying GRI 1, the imported deodorizer distillate is prima facie classifiable under heading 3823. See id. at 14-18. Cargill asserts that the classification of merchandise begins with GRI 1.  See id. at 13 (noting that "GRI 1 provides that classification is to be determined 'according to the terms of the

headings and any relative section or chapter notes'" (quoting GRI 1)). Cargill maintains that heading 3823 "describes monocarboxylic fatty acids, regardless of whether they are presented separately or together in a combination or mixture." Cargill's Mem. at 14. Relying on the explanatory notes of the HTSUS ("Explanatory Notes") Cargill states that merchandise described by heading 3823 may contain substances not classifiable under Section VI but excludes separate chemically defined elements or compounds. See id. at 14-15. Consequently, Cargill argues that "there is no reason for the Court to find a narrower meaning of the terms of Heading 3823 here." Id. at 16.

Cargill further argues that heading 3823 is an eo nomine provision because it specifically describes a class or kind of merchandise by name. See id. Absent contrary legislative intent, such a provision "includes all forms of the described merchandise." Id. Consequently, Cargill argues, heading 3823 includes all monocarboxylic fatty acids, including those "that occur as natural combinations or mixtures of more than one of such fatty acid." Id. Furthermore, Cargill asserts that the subject merchandise is imported in bulk tanks for industrial consumers and, therefore, falls within the definition of industrial. "The term 'industrial' in Heading 3823 refers to the condition in which the merchandise is imported, i.e., in bulk, for industrial consumers." Id. at 17.

Consequently, since heading 3823 specifically provides for the classification of the subject merchandise, Cargill argues that Customs is precluded from classifying it under 3824, the "basket" chemical provision, "which is limited to preparations of the chemical or allied industries that are not elsewhere specified or included." Id.

Cargill further argues that the Explanatory Notes to heading 3823 indicate that industrial monocarboxylic fatty acids are generally obtained by the saponification[2] or hydrolysis of natural fats or oils. See id. at 18-19. According to Cargill, the subject merchandise is obtained "during the deodorization stage in which the [crude] vegetable oil is subjected to steam distillation under a vacuum to remove substances that are undesirable in edible vegetable oil." Id. Cargill also asserts that the exemplars of the merchandise covered by heading 3823 include an article referred to as "fatty acid distillate," which is defined by the method of its production and physical characteristics. See id. at 19. Cargill maintains that the manner in which the subject merchandise is produced and its physical characteristics is the same as the "fatty acid distillate" described in the Explanatory Notes. See

---

[2] "Saponification" is defined as "the decomposition of a fat by the addition of an alkali which combines with its fatty acids to form a soap, the remaining constituent, glycerine, being consequently liberated." Oxford English Dictionary 474 (2nd ed. 1989).

id. Specifically, the fatty acid distillate "is characterized by a high free fatty acid content." Id. (quoting Explanatory Notes). Cargill states that free fatty acids predominate in the subject merchandise over any other substance and, therefore, has the characteristic of a high free fatty acid content and should have been classified under heading 3823. See id. at 19-20. Cargill asserts that the Explanatory Notes merely describe high free fatty acid content as a characteristic of fatty acid distillate. See id. at 24. The Explanatory Notes do not set out "any minimum percentage of free fatty acid content for 'fatty acid distillate.'" Id. Since no tariff definition of "high free fatty acid" exists, Cargill maintains that "if there is no legislative intent to the contrary, the tariff terms are to be construed in accordance with their common or popular meaning." Id. Cargill, citing various dictionary definitions of the word "high," argues that the term means greater than others or prominent in rank or standing. See id. at 25. Since the free fatty acids contained in the subject merchandise are greater than any other substance, Cargill deduces that it qualifies as a "fatty acid distillate" described in the Explanatory Notes. See id. at 24. Cargill maintains that its merchandise "is correctly characterized by a 'high' free fatty acid content and thus, appropriately classified under HTSUS Heading 3823," instead of the "basket" provision, heading 3824. Id. at 25. Classification under heading 3824 is precluded pursuant to GRI 1

because heading 3823 is the more specific heading. See id. at 26-27.

Finally, Cargill contends that Customs' HRL 960311 is not entitled to Skidmore respect because it is based on a number of assumptions that have no analytical or factual support. See id. at 27-28 (referencing Skidmore v. Swift & Co., 323 U.S. 134 (1944)). Moreover, Cargill points out that "the ruling was not subject to formal notice and comment procedures, nor was it adopted as a part of a rulemaking process." Id. at 31. Cargill deduces that HRL 960311 lacks thoroughness, contains unsupported assertions and contains invalid reasoning. See id. at 28-29. While HRL 960311 is consistent with previous rulings, Cargill argues that "those rulings suffer from the same deficiencies that it does." Id. at 29. Furthermore, Cargill contends that HRL 960311 contravenes judicial precedent and implicitly applies the "more than" doctrine which was rejected by the United States Court of Appeals for the Federal Circuit in JVC Co. of Am. v. United States, 234 F.3d 1348, 1353-54 (Fed. Cir. 2001). See Cargill's Mem. at 30-31.

### B. Customs' Contentions

Customs replies that it properly classified the imported deodorizer distillate under subheading 3824.90.28. See Customs' Mem. at 6-31. Customs points out that "the first step in analyzing a classification issue is to examine the terms of the provision at

issue in order to determine legislative intent." Id. at 9 (citation omitted). Turning to the GRI for guidance, Customs concludes that "when determining whether an imported good is classifiable within the scope of a provision encompassing a named material or substance, and the good is a mixture, the essential character of the good must be determined in order to ascertain whether or not it falls within the scope of the tariff provision." Id. at 10-11. Customs asserts that explanatory note VIII to GRI 3(b) elucidates the factors which determine essential character, "by the nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of the goods." Id. at 11-12 (emphasis in original omitted). Accordingly, Customs concludes that an essential character analysis pursuant to GRI 2(b) and GRI 3(b) reveals that the deodorizer distillate's essential character is derived from its tocopherol rather than its fatty acid content. See id. at 27-31. The subject merchandise does not derive its value from its fatty acid content but from its non-fatty acid component. See id. at 30.

Customs also points out that Rule 1(a) of the Additional United States Rules of Interpretation ("ARI") sets forth specific requirements for classification under a "principal use" provision. See id. at 12-13. Customs maintains that "the classification of

merchandise pursuant to ARI 1(a) is controlled by the use of the 'class or kind' of merchandise to which the goods belong and not the 'actual' use to which the specific imported merchandise is put." Id. at 12 (citing Primal Lite, Inc. v. United States, 182 F.3d 1362 (Fed. Cir. 1999)). Accordingly, Customs argues that in reading the GRIs and ARIs together, the imported deodorizer distillate "must be classified based upon that constituent substance from which it derives its essential character and a determination must be made as to whether or not the constituent substances from which it derives its essential character is of the same class or kind as 'industrial monocarboxylic fatty acids.'" Id. at 13.

Since industrial monocarboxylic fatty acids is not statutorily defined, Customs asserts that "the correct meaning of the phrase is its common meaning, in the absence of a proven commercial meaning different from the common meaning or contrary to legislative intent." Id. at 14. While there is no definition for industrial monocarboxylic fatty acids in any standard or technical lexicons, Customs opines that the phrase's meaning can be gleaned from the definitions of the individual terms. See id. at 15. Customs agrees with Cargill that "commercially, 'industrial monocarboxylic fatty acids' is a technical way of identifying a class of fatty acids which consists of 'mixtures or blends of fatty acids.'" Id.

at 16. Furthermore, Customs acknowledges that the kinds of fatty acids covered by heading 3823 are all mixtures or blends of fatty acids. See id. at 16-18. Customs argues, however, that such covered fatty acids are between 90 percent to 100 percent fatty acids with only de minimus amounts of non-fatty acid constituents. See id. at 17-18. A "class or kind" analysis in this case would show that the subject merchandise is not included in the class of goods commercially used as industrial monocarboxylic fatty acids. See id. at 18. Customs maintains that the deodorizer distillate does not have the same general characteristic as the kinds of fatty acids contemplated by the tariff term "industrial monocarboxylic fatty acids." See id. at 19.

Customs also asserts that the fatty acids encompassed by heading 3823 contain a higher percentage of fatty acids than the subject merchandise, 90 percent compared to less than 50 percent. See id. The imported deodorizer distillate is not used the same way as the fatty acids encompassed by heading 3823, which "are used as commercial fatty acids or their constituent chemical fatty acid components are isolated for specific applications." Id. Rather, the subject merchandise "is imported as a primary source material for tocopherols and sterols." Id. at 20. Commerce asserts that it would be impractical for the imported deodorizer distillate to be used for its fatty acid component. See id. Cargill's exhibits

demonstrate that "the value of the deodorizer distillate depends upon the content of the unsaponifiables, pricing is based upon tocopherol content and stigmasterol content, or both, depending on market demand for each ingredient." Customs' Mem. at 20; see Cargill's Mem. at Exs. B and C.

While Customs concedes that the imported deodorizer distillate is "obtained from fats and oils which have been subjected to vacuum distillation in the presence of steam as part of a refining process," Customs argues that the deodorizer distillate is not a fatty acid distillate covered by explanatory note 5 to heading 3823. Id. at 23. The imported deodorizer distillate does not have a sufficiently "high" free fatty acid content to be classified as monocarboxylic fatty acids under heading 3823. The deodorizer distillate has at best a 50 percent fatty acid content whereas the fatty acid mixtures encompassed by the heading contain at least 90 percent fatty acids. See id. Commercially "high" free fatty acid is based on the amount of unsaponified matter contained in the deodorizer distillate and not upon the actual dry weight of the free fatty acids. See id. A deodorizer distillate with 10 percent or more of unsaponifiable matter is considered to be low in fatty acids whereas a deodorizer distillate with less than 5 percent unsaponifiable matter is considered "high" in acidity and, thus, characterized by a high free fatty acids content. See id. at 23-

24. Here, the deodorizer distillate contained more than 10 percent unsaponifiable matter and was considered to be low in free fatty acids. See id. Accordingly, Customs contends that the deodorizer distillate was properly classified under heading 3824 because it is a by-product of the oil refining industry as required by the terms in that heading. See id. at 31. "The deodorizer distillate is similar to the examples of the residual products of chemical or allied industries in the Explanatory Notes to Heading 3824 . . . ." Id. In addition, the subject merchandise is a by-product used, after importation, for the extraction of various substances which are used to manufacture other products. See id.

Finally, Customs asserts that HRL 960311 is entitled to Skidmore respect because Customs has specialized experience in the classification of merchandise. Customs relied on this expertise in HRL 960311 to give "a reasoned analysis of the proper classification of the merchandise at issue here." Id. at 37. Customs' decision is supported "by the plain language of the competing provisions, basic tenets of classification, and the framework of the HTSUS as it applies to fatty acids, mixtures of fatty acids, and their derivatives." Id. at 38. Customs also maintains that HRL 960311 is consistent with prior classifications of similar merchandise. See id. at 39-40.

## III. Analysis

### A.    Motion for Summary Judgment

Determining whether imported merchandise was classified under the appropriate tariff provision entails a two-step process.  See Sabritas, S.A. de C.V. v. United States, 22 CIT 59, 61, 998 F. Supp 1123, 1126 (1998).  First, the proper meaning of specific terms in the tariff provision must be ascertained.  Second, whether the imported merchandise falls within the scope of such term, as properly construed, must be determined.  See Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1391 (Fed. Cir. 1994).  The first step is a question of law and the second is a question of fact. See id.; see also Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997).  Pursuant to 28 U.S.C. § 2639(a)(1) (1994), Customs' classification is presumed correct and the party challenging the classification bears the burden of proving otherwise.  See Universal Elecs., 112 F.3d at 491.  This presumption, however, applies only to Customs' factual findings, such as whether the subject merchandise falls within the scope of the tariff provision, and not to questions of law, such as Customs' interpretation of a particular tariff provision.  See Sabritas, 22 CIT at 61, 998 F. Supp. at 1126; see also Universal Elecs., 112 F.3d at 491; Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995).  When there are no material issues of fact in dispute, as is admitted by both parties in the present case, the

statutory presumption of correctness is irrelevant. Goodman Mfg., 69 F.3d at 508.

The ultimate question in every tariff classification is one of law; "whether the merchandise is properly classified under one or another classification heading." Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Where, as in the instant case, there is no disputed material issue of fact to be resolved by trial, disposition by summary judgment is appropriate. Pursuant to 28 U.S.C. § 2640(a) (1994), Customs' classification decision is subject to de novo review based upon the record before the Court. Accordingly, the Court must determine "whether the government's classification is correct, both independently and in comparison with the importer's alternative." Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).

### B. Skidmore Respect

As a preliminary matter, the Court finds that Customs is not entitled to Skidmore respect. In Skidmore, 323 U.S. at 140, the Supreme Court set forth the factors a reviewing court is to consider in determining how much weight an agency's decision is to be afforded. The amount of respect an agency's decision is afforded by a court "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which

give it the power to persuade, if lacking power to control." Id.
The power to persuade of each Customs' classification ruling may
vary depending on the Skidmore factors articulated in United States
v. Mead, 533 U.S. 218 (2001).  See Structural Indus., Inc. v.
United States, 356 F.3d 1366, 1370 (Fed. Cir. 2004).  Applying
these factors to the case at bar, the Court finds that Customs did
not give thorough consideration and provide valid reasoning in HRL
960311.[3]  The Court recognizes that Customs classification rulings
are entitled to "a respect proportional to [their] 'power to
persuade'," Mead, 533 U.S. at 235 (quoting Skidmore, 323 U.S. at
140), but the Court has an "independent responsibility to decide
the legal issue regarding the proper meaning and scope of the HTSUS
terms."  Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed.
Cir. 2002) (citing Rocknel Fastener, Inc. v. United States, 267
F.3d 1354, 1358 (Fed Cir. 2001)).

### C.   Classification Under Heading 3823

Cargill argues that the application of GRI 1 renders the
imported deodorizer distillate as prima facie classifiable under
heading 3823, HTSUS.  See Cargill's Mem. at 14-18.  Cargill
contends that this heading encompasses a class or kind of
merchandise, industrial monocarboxylic fatty acids, which includes

---

[3]    The Court notes, however, that Customs has specialized
experience which can aide the Court in its review of the questions
at issue in this case.  See Mead, 533 U.S. at 234.

the subject merchandise.  See id.  If Cargill is correct that the deodirizer distillate is classifiable under heading 3823, then Customs' classification under heading 3824, a "basket" provision, would be incorrect.  The classification of imported merchandise under a "basket" provision is only appropriate when there is no other tariff category that covers the merchandise more specifically.  See EM Indus., Inc. v. United States, 22 CIT 156, 165, 999 F. Supp. 1473, 1480 (1998) (stating that "'[b]asket' or residual provisions of HTSUS Headings . . . are intended as a broad catch-all to encompass the classification of articles for which there is no more specifically applicable subheading").  Consequently, the Court must first determine whether the imported deodorizer distillate is more specifically classifiable under heading 3823.  See Lynteq, Inc. v. United States, 976 F.2d 693, 698 (Fed. Cir. 1992).

Pursuant to GRI 1, the definition and scope of terms of a particular provision is to be determined by the wording of the statute and any relevant section or chapter notes.  See Sabritas, 22 CIT at 62, 998 F. Supp. at 1126-27.  GRI 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ."  Although Cargill asserts that heading 3823 is an eo nomine provision, the Court finds that, for the reasons set forth below,

heading 3823 is not an <u>eo nomine</u> provision but rather a designation for goods by class.

If a tariff term is not statutorily defined in the HTSUS and its intended meaning cannot be discerned from legislative history, then the definition is determined by ascertaining its common and commercial meaning. <u>See</u> <u>Lynteq</u>, 976 F.2d at 697-98; <u>see also</u> <u>Mita Copystar Am. v. United States</u>, 21 F.3d 1079, 1082 (Fed. Cir. 1994). To ascertain a tariff term's common meaning, the Court may consult dictionaries and scientific authorities, as well as its own understanding of the term. <u>See</u> <u>Brookside Veneers, Ltd. v. United States</u>, 847 F.2d 786, 789 (Fed. Cir. 1998), <u>cert. denied</u>, 488 U.S. 943 (1988). The common and commercial meaning of a term is presumed to be the same. <u>See</u> <u>Sarne Handbags Corp. v. United States</u>, 24 CIT 309, 316, 100 F. Supp. 2d 1126, 1133 (2000). The Court, in determining the definition of tariff terms, may also use the <u>Explanatory Notes</u>, which provide guidance in interpreting the language of the HTSUS. <u>See</u> <u>Bausch & Lomb, Inc. v. United States</u>, 21 CIT 166, 174, 957 F. Supp. 281, 288 (1997), <u>aff'd</u>, 148 F.3d at 1363.[4]

---

[4]     The <u>Explanatory Notes</u> are not legally binding on the United States, yet they "generally indicate the 'proper interpretation' of provisions within the HTSUS . . . [and] are persuasive authority for the Court when they specifically include or exclude an item from a tariff heading." <u>Sabritas</u>, 22 CIT at 62, 998 F. Supp at 1127.

While heading 3823 encompasses "industrial monocarboxylic fatty acids; acid oils from refining; industrial fatty alcohols," see HTSUS 3823, the definition of "industrial monocarboxylic fatty acids" is not specifically defined in the HTSUS or in the relevant legislative history. Consequently, the Court must determine, as a matter of law, the common and commercial meaning of the phrase. See E.M. Chems. v. United States, 920 F.2d 910, 912 (Fed. Cir. 1990). While the definition of the phrase is not found in any standard or technical dictionaries, its meaning may be constructed based upon the definition of the individual terms. A carboxylic acid "may be classified in terms of the number of carboxyl (-COOH) groups it contains. If one carboxyl group [exists], it is designated as monocarboxylic . . . ." Van Nostrand's Scientific Encyclopedia 508 (7th ed. 1989). Fatty acid is "an organic monobasic acid . . . derived from the saturated series of aliphatic hydrocarbons . . . ." McGraw-Hill Dictionary of Scientific and Technical Terms 780 (6th ed. 2003).

Cargill asserts that the Explanatory Notes to heading 3823 indicate that monocarboxylic fatty acids "are generally manufactured by the saponification or hydrolysis of natural fats or oils." See Cargill's Mem. at 18. In addition, Cargill maintains that "[t]he method of production and physical characteristics [of the exemplar labeled fatty acid distillate] match exactly the

method of production and physical characteristics of the subject deodorizer distillate." Id. at 19. Accordingly, Cargill contends that the imported deodorizer distillate is a monocarboxylic fatty acid under the description contained in the Explanatory Notes, and consequently prima facie classifiable under heading 3823. The Court agrees with Cargill and finds that the imported deodorizer distillate constitutes "monocarboxylic fatty acids." The deodorizer distillate is a by-product of the refining of crude vegetable oils and contains free fatty acids, including oleic, linoleic, stearic, palmitic and linolenic acids, and is obtained through the process described by the Explanatory Notes to heading 3823.

In drafting the HTSUS, Congress thought it appropriate to add the term "industrial" before the phrase "monocarboxylic fatty acids." Consequently, the Court must determine whether the imported deodorizer distillate constitutes monocarboxylic fatty acids within the scope of the definition of industrial. Cargill argues that "industrial" refers to the condition in which merchandise is imported, i.e. in bulk for industrial consumers. See Cargill's Mem. at 17. The Court does not agree. The common definition of the term "industrial" is "of a quality suitable for industrial use." Oxford English Dictionary 897 (7th ed. 1989). In heading 3823, the term "industrial" is an adjective describing the

manner in which monocarboxylic fatty acids are to be used. While heading 3823 provides the more specific description of deodorizer distillate by referring to its dominant component, monocarboxylic fatty acids, the Court finds that heading 3823 is a use provision, describing a class or kind of merchandise by name. The classification decision turns on whether the imported deodorizer distillate can be characterized as containing <u>industrial</u> monocarboxylic fatty acids, that is whether the monocarboxylic fatty acids are "employed, required or used in industry." <u>Webster's II New Riverside University Dictionary</u> 625 (1988). Consequently, the Court holds that the deodorizer distillate is not <u>prima facie</u> classifiable under heading 3823.

Cargill alternatively argues that if the imported deodorizer distillate is <u>prima facie</u> classifiable under two headings, either heading 3823 or 3824, then, pursuant to GRI 2(b) and GRI 3(a) the subject merchandise should be classified under heading 3823. <u>See</u> Cargill's Mem. at 17 n.4. The Court finds that an analysis under either GRI 2(b) or GRI 3(a) excludes the deodorizer distillate from classification under heading 3823. This Court has noted that GRI 2(b) instructs that "any reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance." <u>Pillowtex Corp. v. United States</u>, 21 CIT 1154, 1157, 983 F. Supp. 188, 191 (1997),

aff'd, 171 F.3d 1370 (Fed. Cir. 1999). Plaintiff, in that case, claimed that its comforters filled with down should be classified as a "comforter of cotton" because GRI 2(b) extended the terms of a heading to include merchandise only partially comprised of the named material, and GRI 3(b) required classification based upon the essential character of the merchandise. See id. According to the plaintiff, its merchandise's essential character was the part of the good which predominated by weight, i.e. the cotton outer shell of the comforter.

In the case at bar, Cargill makes the a similar unconvincing argument. Cargill argues that the imported deodorizer distillate should be classified as an "industrial monocarboxylic fatty acid" because its free fatty acid content is in greater quantity than any other component. See Cargill's Mem. at 23-25. Tariff terms, however, should be interpreted to avoid absurd or anomalous results. See Pillowtex, 21 CIT at 1157, 983 F. Supp. at 191. An essential character analysis made according to GRI 2(b) and GRI 3(b) reveals that the essential character of the imported deodorizer distillate is not derived from its fatty acid content. Moreover, ARI 1 dictates how classification should be construed when a classification decision is controlled by use. Rule 1(a) of the ARI deals with "principal use" provisions while ARI 1(b) deals with "actual use" provisions. See Primal Lite, 182 F.3d at 1363.

The rule states:

> a tariff classification controlled by use (other than
> actual use) is to be determined in accordance with the
> use in the United States at, or immediately prior to, the
> date of importation, of goods of that class or kind to
> which the imported goods belong, and the controlling use
> is the <u>principal use</u>.

ARI 1(a) (emphasis added). "Principal use" means the use which is greater than any other single use of the good. <u>See</u> <u>Minnetonka Brands, Inc. v. United States</u>, 24 CIT 645, 651, 110 F. Supp. 2d 1020, 1027 (2000). The "principal use" provision is used to classify particular merchandise according to the ordinary use of such merchandise. <u>See</u> <u>Primal Lite</u>, 182 F.3d at 1364-65 (construing ARI 1(a) as calling for a "determination as to the group of goods that are commercially fungible with the imported goods").

The Court finds that the deodorizer distillate's essential character is not of the same class or kind as industrial monocarboxylic fatty acids encompassed by heading 3823. While the imported deodorizer distillate's predominant component is free fatty acids, it contains less than 50 percent free fatty acids. Furthermore, the subject merchandise is not imported, obtained or used for its fatty acid content. Rather, the subject merchandise is used as a source material for its other components, specifically tocopherol and sterol. Heading 3823 specifically encompasses such fatty acids as stearic acid, oleic acid, tall oil acids and fatty acids derived from coconut, palm-kernel and palm oil. The

composition of these fatty acids indicates that they are comprised of multiple types of fatty acids with de minimus amounts of non-fatty acid constituents.  The Court agrees with Customs that the deodorizer distillate is not like the other goods encompassed by heading 3823 because the fatty acid component of the merchandise is not the part of the good with any commercial significance.  In addition, the deodorizer distillate is not commercially fungible with the monocarboxylic fatty acids classified under heading 3823.

**D.   Customs' Classification of the Imported Deodorizer Distillate Under HTSUS Subheading 3824.90.28**

The Court finds that the imported deodorizer distillate was properly classified under subheading 3824.90.28.  As demonstrated in the above analysis, the deodorizer distillate is not encompassed by heading 3823.  Since the merchandise does not fit under a named provision, it must be classified elsewhere, under the basket provision 3824.90.28.  See EM Indus., 22 CIT at 165, 999 F. Supp. at 1480.  Classification under this provision is proper because the deodorizer distillate is undisputedly a by-product of a chemical or allied industry.  Furthermore, the deodorizer distillate is similar to the examples contained in the Explanatory Notes to heading 3824, of the by-products or residual products of chemical or allied industries used in the manufacture of other products.  See Explanatory Notes.  Deodorizer distillate fits into this category, as after importation, various substances are extracted from it and

used in the manufacture of other products. Additionally, the subject imported deodorizer distillate contains more than 5 percent tocopherols and sterols, the components extracted and used in manufacturing. These are aromatic substances, properly classified under heading 3824: "Mixtures containing 5 percent of more by weight of one or more aromatic or modified aromatic substances: Other." Accordingly, the Court finds that Customs properly classified the imported deodorizer distillate under 3824.90.28.

## CONCLUSION

The deodorizer distillate does not fall within the common meaning of the tariff terms "industrial monocarboxylic fatty acids" because, even though they contain fatty acids, the imported goods do not have the essential character of the same class or kind of goods encompassed by heading 3823. The deodorizer distillate is imported, obtained, and used for its other components, i.e. tocopherols and sterols, and not its fatty acid content. The types of fatty acids covered within the class designated "industrial monocarboxylic fatty acids" are used as commercial fatty acids. The deodorizer distillate, however, is imported and valued for its tocopherols and sterols content. Furthermore, the pricing of deodorizer distillate is determined based on the content of tocopherol and stigmasterol, depending on the market demand for each ingredient. Accordingly, Customs properly classified the

subject merchandise under 3824.90.28.  For the foregoing reasons, Cargill's motion for summary judgment is denied and Customs' motion for summary judgment is granted.  Judgment will be entered accordingly.


                                        /s/ NICHOLAS TSOUCALAS
                                         NICHOLAS TSOUCALAS
                                          SENIOR JUDGE


Dated:    March 18, 2004
          New York, New York